DANDRIDGE, CHAIRMAN, MARYLAND BOARD
OF PUBLIC WELFARE, ET AL. *v.*
WILLIAMS ET AL.

No. 131.   Argued December 9, 1969—Decided April 6, 1970

*George W. Liebmann,* Assistant Attorney General of Maryland, argued the cause for appellants. With him on the briefs were *Francis B. Burch,* Attorney General, *Robert F. Sweeney,* Deputy Attorney General, and *J. Michael McWilliams,* Assistant Attorney General.

*Joseph A. Matera* argued the cause and filed a brief for appellees.

*Thomas C. Lynch,* Attorney General, and *Elizabeth Palmer,* Deputy Attorney General, filed a brief for the State of California as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *Thomas L. Fike* for the Legal Aid Society of Alameda County, and by *Carl Rachlin, Anthony B. Ching, Peter E. Sitkin,* and *Steven J. Antler* for the Center on Social Welfare Policy and Law et al.

MR. JUSTICE STEWART delivered the opinion of the Court.

This case involves the validity of a method used by Maryland, in the administration of an aspect of its public welfare program, to reconcile the demands of its needy citizens with the finite resources available to meet those demands. Like every other State in the Union, Maryland participates in the Federal Aid to Families

With Dependent Children (AFDC) program, 42 U. S. C. § 601 *et seq.* (1964 ed. and Supp. IV), which originated with the Social Security Act of 1935.[1] Under this jointly financed program, a State computes the so-called "standard of need" of each eligible family unit within its borders. See generally *Rosado* v. *Wyman, ante,* p. 397. Some States provide that every family shall receive grants sufficient to meet fully the determined standard of need. Other States provide that each family unit shall receive a percentage of the determined need. Still others provide grants to most families in full accord with the ascertained standard of need, but impose an upper limit on the total amount of money any one family unit may receive. Maryland, through administrative adoption of a "maximum grant regulation," has followed this last course. This suit was brought by several AFDC recipients to enjoin the application of the Maryland maximum grant regulation on the ground that it is in conflict with the Social Security Act of 1935 and with the Equal Protection Clause of the Fourteenth Amendment. A three-judge District Court convened pursuant to 28 U. S. C. § 2281, held that the Maryland regulation violates the Equal Protection Clause. 297 F. Supp. 450. This direct appeal followed, 28 U. S. C. § 1253, and we noted probable jurisdiction, 396 U. S. 811.

The operation of the Maryland welfare system is not complex. By statute[2] the State participates in the AFDC program. It computes the standard of need for each eligible family based on the number of children in the family and the circumstances under which the family lives. In general, the standard of need increases with each additional person in the household, but the incre-

---

[1] 49 Stat. 620, as amended, 42 U. S. C. §§ 301–1394 (1964 ed. and Supp. IV).

[2] Maryland Ann. Code, Art. 88A, § 44A *et seq.* (1969 Repl. Vol.).

ments become proportionately smaller.[3]   The regulation here in issue imposes upon the grant that any single family may receive an upper limit of $250 per month in certain counties and Baltimore City, and of $240 per month elsewhere in the State.[4]   The appellees all

---

[3] The schedule for determining subsistence needs is set forth in an Appendix to this opinion.

[4] The regulation now provides:

"B. *Amount*—The amount of the grant is the resulting amount of need when resources are deducted from requirements as set forth in this Rule, subject to a maximum on each grant from each category:

"1. $250—for local departments under any 'Plan A' of Shelter Schedule

"2. $240—for local departments under any 'Plan B' of Shelter Schedule

"*Except that:*

"a. If the requirements of a child over 18 are included to enable him to complete high school or training for employment (III–C–3), the grant may exceed the maximum by the amount of such child's needs.

"b. If the resource of support is paid as a refund (VI–B–6), the grant may exceed the maximum by an amount of such refund.   This makes consistent the principle that the amount from public assistance funds does not exceed the maximum.

"c. The maximum may be exceeded by the amount of an emergency grant for items not included in a regular monthly grant. (VIII)

"d. The maximum may be exceeded up to the amount of a grant to a person in one of the nursing homes specified in Schedule D, Section a.

"3. A grant is subject to any limitation established because of insufficient funds."

Md. Manual of Dept. of Social Services, Rule 200, § X, B, p. 23, formerly Md. Manual of Dept. of Pub. Welfare, pt. II, Rule 200, § VII, 1, p. 20.

In addition, AFDC recipients in Maryland may be eligible for certain assistance in kind, including food stamps, public housing, and medical aid.  See, *e. g.,* 42 U. S. C. § 1396 *et seq.* (1964 ed., Supp. IV); 7 U. S. C. §§ 1695–1697.  The applicable provisions of state and federal law also permit recipients to keep part of their

have large families, so that their standards of need as computed by the State substantially exceed the maximum grants that they actually receive under the regulation. The appellees urged in the District Court that the maximum grant limitation operates to discriminate against them merely because of the size of their families, in violation of the Equal Protection Clause of the Fourteenth Amendment. They claimed further that the regulation is incompatible with the purpose of the Social Security Act of 1935, as well as in conflict with its explicit provisions.

In its original opinion the District Court held that the Maryland regulation does conflict with the federal statute, and also concluded that it violates the Fourteenth Amendment's equal protection guarantee. After reconsideration on motion, the court issued a new opinion resting its determination of the regulation's invalidity entirely on the constitutional ground.[5] Both the statutory and constitutional issues have been fully briefed and argued here, and the judgment of the District Court must, of course, be affirmed if the Maryland regulation is in conflict with either the federal statute or the Constitution.[6] We consider the statutory question first, be-

---

earnings from outside jobs. 42 U. S. C. §§ 630–644 (1964 ed., Supp. IV); Md. Manual of Dept. of Social Services, Rule 200, § VI, B (8)(c)(2). Both federal and state law require that recipients seek work and take it if it is available. 42 U. S. C. § 602 (a)(19)(F) (1964 ed., Supp. IV); Md. Manual of Dept. of Social Services, Rule 200, § III (D)(1)(d).

[5] Both opinions appear at 297 F. Supp. 450.

[6] The prevailing party may, of course, assert in a reviewing court any ground in support of his judgment, whether or not that ground was relied upon or even considered by the trial court. Compare *Langnes* v. *Green*, 282 U. S. 531, 538, with *Story Parchment Co.* v. *Paterson Parchment Paper Co.*, 282 U. S. 555, 567–568. As the Court said in *United States* v. *American Ry. Exp. Co.*, 265 U. S. 425, 435–436: "[I]t is likewise settled that the appellee may, without

cause if the appellees' position on this question is correct, there is no occasion to reach the constitutional issues. *Ashwander* v. *TVA*, 297 U. S. 288, 346–347 (Brandeis, J., concurring); *Rosenberg* v. *Fleuti*, 374 U. S. 449.

## I

The appellees contend that the maximum grant system is contrary to § 402 (a) (10) of the Social Security Act, as amended,[7] which requires that a state plan shall

> "provide . . . that all individuals wishing to make application for aid to families with dependent children shall have opportunity to do so, and that aid to families with dependent children shall be furnished with reasonable promptness to all eligible individuals."

The argument is that the state regulation denies benefits to the younger children in a large family. Thus, the appellees say, the regulation is in patent violation of the Act, since those younger children are just as "dependent"

taking a cross-appeal, urge in support of a decree any matter appearing in the record, although his argument may involve an attack upon the reasoning of the lower court or an insistence upon matter overlooked or ignored by it. By the claims now in question, the American does not attack, in any respect, the decree entered below. It merely asserts additional grounds why the decree should be affirmed." When attention has been focused on other issues, or when the court from which a case comes has expressed no views on a controlling question, it may be appropriate to remand the case rather than deal with the merits of that question in this Court. See *Aetna Cas. & Sur. Co.* v. *Flowers*, 330 U. S. 464, 468; *United States* v. *Ballard*, 322 U. S. 78, 88. That is not the situation here, however. The issue having been fully argued both here and in the District Court, consideration of the statutory claim is appropriate. *Bondholders Committee* v. *Commissioner*, 315 U. S. 189, 192 n. 2; H. Hart & H. Wechsler, The Federal Courts and the Federal System 1394 (1953). See also *Jaffke* v. *Dunham*, 352 U. S. 280.

[7] 64 Stat. 550, as amended, 76 Stat. 185, 81 Stat. 881, 42 U. S. C. § 602 (a) (10) (1964 ed., Supp. V).

as their older siblings under the definition of "dependent child" fixed by federal law.[8] See *King* v. *Smith,* 392 U. S. 309. Moreover, it is argued that the regulation, in limiting the amount of money any single household may receive, contravenes a basic purpose of the federal law by encouraging the parents of large families to "farm out" their children to relatives whose grants are not yet subject to the maximum limitation.

It cannot be gainsaid that the effect of the Maryland maximum grant provision is to reduce the per capita benefits to the children in the largest families. Although the appellees argue that the younger and more recently arrived children in such families are totally deprived of aid, a more realistic view is that the lot of the entire family is diminished because of the presence of additional children without any increase in payments. Cf. *King* v. *Smith, supra,* at 335 n. 4 (DOUGLAS, J., concurring). It is no more accurate to say that the last child's grant is wholly taken away than to say that the grant of the first child is totally rescinded. In fact, it is the *family* grant

---

[8] 42 U. S. C. § 606 (a) (1964 ed., Supp. IV) provides:

"The term 'dependent child' means a needy child (1) who has been deprived of parental support or care by reason of the death, continued absence from the home, or physical or mental incapacity of a parent, and who is living with his father, mother, grandfather, grandmother, brother, sister, stepfather, stepmother, stepbrother, stepsister, uncle, aunt, first cousin, nephew, or niece, in a place of residence maintained by one or more of such relatives as his or their own home, and (2) who is (A) under the age of eighteen, or (B) under the age of twenty-one and (as determined by the State in accordance with standards prescribed by the Secretary) a student regularly attending a school, college, or university, or regularly attending a course of vocational or technical training designed to fit him for gainful employment."

The Act also covers children who have been placed in foster homes pursuant to judicial order or because they are state charges. 42 U. S. C. § 608 (1964 ed., Supp. IV).

that is affected. Whether this per capita diminution is compatible with the statute is the question here. For the reasons that follow, we have concluded that the Maryland regulation is permissible under the federal law.

In *King* v. *Smith, supra,* we stressed the States' "undisputed power," under these provisions of the Social Security Act, "to set the level of benefits and the standard of need." *Id.,* at 334. We described the AFDC enterprise as "a scheme of cooperative federalism," *id.,* at 316, and noted carefully that "[t]here is no question that States have considerable latitude in allocating their AFDC resources, since each State is free to set its own standard of need and to determine the level of benefits by the amount of funds it devotes to the program." *Id.,* at 318–319.

Congress was itself cognizant of the limitations on state resources from the very outset of the federal welfare program. The first section of the Act, 42 U. S. C. § 601 (1964 ed., Supp. IV), provides that the Act is

> "For the purpose of encouraging the care of dependent children in their own homes or in the homes of relatives by enabling each State to furnish financial assistance and rehabilitation and other services, *as far as practicable under the conditions in such State,* to needy dependent children and the parents or relatives with whom they are living to help maintain and strengthen family life and to help such parents or relatives to attain or retain capability for the maximum self-support and personal independence consistent with the maintenance of continuing parental care and protection . . . ." (Emphasis added.)

Thus the starting point of the statutory analysis must be a recognition that the federal law gives each State great latitude in dispensing its available funds.

The very title of the program, the repeated references to families added in 1962, Pub. L. 87–543, § 104 (a)(3), 76 Stat. 185, and the words of the preamble quoted above, show that Congress wished to help children through the family structure. The operation of the statute itself has this effect. From its inception the Act has defined "dependent child" in part by reference to the relatives with whom the child lives.[9] When a "dependent child" is living with relatives, then "aid" also includes payments and medical care to those relatives, including the spouse of the child's parent. 42 U. S. C. § 606 (b) (1964 ed., Supp. IV). Thus, as the District Court noted, the amount of aid "is . . . computed by treating the relative, parent or spouse of parent, as the case may be, of the 'dependent child' as a part of the family unit." 297 F. Supp., at 455. Congress has been so desirous of keeping dependent children within a family that in the Social Security Amendments of 1967 it provided that aid could go to children whose need arose merely from their parents' unemployment, under federally determined standards, although the parent was not incapacitated. 42 U. S. C. § 607 (1964 ed., Supp. IV).

The States must respond to this federal statutory concern for preserving children in a family environment. Given Maryland's finite resources, its choice is either to support some families adequately and others less adequately, or not to give sufficient support to any family. We see nothing in the federal statute that forbids a State to balance the stresses that uniform insufficiency of payments would impose on all families against the greater ability of large families—because of the inherent

---

[9] 42 U. S. C. § 606 (a) (1964 ed., Supp. IV), *supra*, n. 8, formerly § 406, 49 Stat. 629, as amended, § 321, 70 Stat. 850. See also S. Rep. No. 628, 74th Cong., 1st Sess., 16–17 (1935).

economies of scale—to accommodate their needs to diminished per capita payments. The strong policy of the statute in favor of preserving family units does not prevent a State from sustaining as many families as it can, and providing the largest families somewhat less than their ascertained per capita standard of need.[10] Nor does the maximum grant system necessitate the dissolution of family bonds. For even if a parent should be inclined to increase his per capita family income by sending a child away, the federal law requires that the child, to be eligible for AFDC payments, must live with one of several enumerated relatives.[11] The kinship tie may be attenuated but it cannot be destroyed.

The appellees rely most heavily upon the statutory requirement that aid "shall be furnished with reasonable promptness to all eligible individuals." 42 U. S. C. § 602 (a)(10) (1964 ed., Supp. IV). But since the statute leaves the level of benefits within the judgment of the State, this language cannot mean that the "aid" furnished must equal the total of each individual's standard of need in every family group. Indeed the appellees do not deny that a scheme of proportional reductions for all families could be used that would result in no individual's receiving aid equal to his standard of need. As we have

---

[10] The Maryland Dept. of Social Services, Monthly Financial and Statistical Report, Table 7 (Nov. 1969), indicates that 32,504 families receive AFDC assistance. In the Maryland Dept. of Social Services, 1970 Fiscal Year Budget, the department estimated that 2,537 families would be affected by the removal of the maximum grant limitation. It thus appears that only one-thirteenth of the AFDC families in Maryland receive less than their determined need because of the operation of the maximum grant regulation. Of course, if the same funds were allocated subject to a percentage limitation, no AFDC family would receive funds sufficient to meet its determined need.

[11] 42 U. S. C. § 606 (a) (1964 ed., Supp. IV), n. 8, supra.

noted, the practical effect of the Maryland regulation is that all children, even in very large families, do receive some aid. We find nothing in 42 U. S. C. § 602 (a) (10) (1964 ed., Supp. IV) that requires more than this.[12] So long as some aid is provided to all eligible families and all eligible children, the statute itself is not violated.

This is the view that has been taken by the Secretary of Health, Education, and Welfare (HEW), who is charged with the administration of the Social Security Act and the approval of state welfare plans. The parties have stipulated that the Secretary has, on numerous occasions, approved the Maryland welfare scheme, including its provision of maximum payments to any one family, a provision that has been in force in various forms since 1947. Moreover, a majority of the States pay less than their determined standard of need, and 20 of these States impose maximums on family grants of the kind here in issue.[13] The Secretary has not disapproved any state plan because of its maximum grant

---

[12] The State argues that in the total context of the federal statute, reference to "eligible individuals" means eligible applicants for AFDC grants, rather than all the family members whom the applicants may represent, and that the statutory provision was designed only to prevent the use of waiting lists. There is considerable support in the legislative history for this view. See H. R. Rep. No. 1300, 81st Cong., 1st Sess., 48, 148 (1949); 95 Cong. Rec. 13934 (1949) (remarks of Rep. Forand). And it is certainly true that the statute contemplates that actual payments will be made to responsible adults. See, e. g., 42 U. S. C. § 605. For the reasons given above, however, we do not find it necessary to consider this argument.

[13] See HEW Report on Money Payments to Recipients of Special Types of Public Assistance, Oct. 1967, Table 4 (NCSS Report D-4). See also Hearings on H. R. 5710 before the House Committee on Ways and Means, 90th Cong., 1st Sess., pt. 1, p. 118 (1967).

provision. On the contrary, the Secretary has explicitly recognized state maximum grant systems.[14]

Finally, Congress itself has acknowledged a full awareness of state maximum grant limitations. In the Amendments of 1967 Congress added to § 402 (a) a subsection, 23:

> "[The State shall] provide that by July 1, 1969, the amounts used by the State to determine the needs of individuals will have been adjusted to reflect fully changes in living costs since such amounts were established, and *any maximums that the State imposes on the amount of aid paid to families will have been proportionately adjusted.*" 81 Stat. 898, 42 U. S. C. § 602 (a)(23) (1964 ed., Supp. IV). (Emphasis added.)

This specific congressional recognition of the state maximum grant provisions is not, of course, an approval of any specific maximum. The structure of specific maximums Congress left to the States, and the validity of any such structure must meet constitutional tests. However, the above amendment does make clear that Con-

---

[14] HEW, State Maximums and Other Methods of Limiting Money Payments to Recipients of Special Types of Public Assistance, Oct. 1962, p. 3:

"When States are unable to meet need as determined under their standards they reduce payments on a percentage or flat reduction basis . . . . These types of limitations may be used in the absence of, or in conjunction with, legal or administrative maximums. A maximum limits the amount of assistance that may be paid to persons whose determined need exceeds that maximum, whereas percentage or flat reductions usually have the effect of lowering payments to most or all recipients to a level below that of determined need."

See also HEW Interim Policy Statement of May 31, 1968, 33 Fed. Reg. 10230 (1968); 45 CFR § 233.20 (a)(2)(ii), 34 Fed. Reg. 1394 (1969).

gress fully recognized that the Act permits maximum grant regulations.[15]

For all of these reasons, we conclude that the Maryland regulation is not prohibited by the Social Security Act.

## II

Although a State may adopt a maximum grant system in allocating its funds available for AFDC payments without violating the Act, it may not, of course, impose a regime of invidious discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment. Maryland says that its maximum grant regulation is wholly free of any invidiously discriminatory purpose or effect, and that the regulation is rationally supportable on at least four entirely valid grounds. The regulation can be clearly justified, Maryland argues, in terms of legitimate state interests in encouraging gainful employment, in maintaining an equitable balance in economic status as between welfare families and those sup-

---

[15] The provisions of 42 U. S. C. § 1396b (f) (1964 ed., Supp. IV), also added by the Amendments of 1967, 81 Stat. 898, are consistent with this view. That section provides that no medical assistance shall be given to any family that has a certain level of income. The section, however, makes an exception, 42 U. S. C. § 1396b (f) (1) (B) (ii) (1964 ed., Supp. IV):

"If the Secretary finds that the operation of a uniform maximum limits payments to families of more than one size, he may adjust the amount otherwise determined under clause (i) to take account of families of different sizes."

These provisions have particular significance in light of the Administration's initial effort to secure a law forcing each State to pay its full standard of need. See Rosado v. Wyman, supra.

This recognition of the existence of state maximums is not new with the Amendments of 1967. In reporting on amendments to the Social Security Act in 1962, 76 Stat. 185, the Senate committee referred to "States in which there is a maximum limiting the amount of assistance an individual may receive." S. Rep. No. 1589, 87th Cong., 2d Sess., 14 (1962).

ported by a wage-earner, in providing incentives for family planning, and in allocating available public funds in such a way as fully to meet the needs of the largest possible number of families. The District Court, while apparently recognizing the validity of at least some of these state concerns, nonetheless held that the regulation "is invalid on its face for overreaching," 297 F. Supp., at 468—that it violates the Equal Protection Clause "[b]ecause it cuts too broad a swath on an indiscriminate basis as applied to the entire group of AFDC eligibles to which it purports to apply . . . ." 297 F. Supp., at 469.

If this were a case involving government action claimed to violate the First Amendment guarantee of free speech, a finding of "overreaching" would be significant and might be crucial. For when otherwise valid governmental regulation sweeps so broadly as to impinge upon activity protected by the First Amendment, its very overbreadth may make it unconstitutional. See, *e. g.*, *Shelton* v. *Tucker*, 364 U. S. 479. But the concept of "overreaching" has no place in this case. For here we deal with state regulation in the social and economic field, not affecting freedoms guaranteed by the Bill of Rights, and claimed to violate the Fourteenth Amendment only because the regulation results in some disparity in grants of welfare payments to the largest AFDC families.[16] For this Court to approve the invalidation of state economic or social regulation as "overreaching" would be far too reminiscent of an era when the Court thought the Fourteenth Amendment gave it power to strike down state laws "because they may be unwise, improvident, or out of harmony with a particular school of thought." *Williamson* v. *Lee Optical Co.*, 348 U. S. 483, 488. That

---

[16] Cf. *Shapiro* v. *Thompson*, 394 U. S. 618, where, by contrast, the Court found state interference with the constitutionally protected freedom of interstate travel.

era long ago passed into history. *Ferguson* v. *Skrupa,* 372 U. S. 726.

In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some "reasonable basis," it does not offend the Constitution simply because the classification "is not made with mathematical nicety or because in practice it results in some inequality." *Lindsley* v. *Natural Carbonic Gas Co.,* 220 U. S. 61, 78. "The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific." *Metropolis Theatre Co.* v. *City of Chicago,* 228 U. S. 61, 69–70. "A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." *McGowan* v. *Maryland,* 366 U. S. 420, 426.

To be sure, the cases cited, and many others enunciating this fundamental standard under the Equal Protection Clause, have in the main involved state regulation of business or industry. The administration of public welfare assistance, by contrast, involves the most basic economic needs of impoverished human beings. We recognize the dramatically real factual difference between the cited cases and this one, but we can find no basis for applying a different constitutional standard.[17] See *Snell* v. *Wyman,* 281 F. Supp. 853, aff'd, 393 U. S. 323. It is a standard that has consistently been applied to state legislation restricting the availability of employment opportunities. *Goesaert* v. *Cleary,* 335 U. S. 464; *Kotch* v. *Board of River Port Pilot Comm'rs,* 330 U. S. 552. See also *Flemming* v. *Nestor,* 363 U. S. 603. And it is a

---

[17] It is important to note that there is no contention that the Maryland regulation is infected with a racially discriminatory purpose or effect such as to make it inherently suspect. Cf. *McLaughlin* v. *Florida,* 379 U. S. 184.

standard that is true to the principle that the Fourteenth Amendment gives the federal courts no power to impose upon the States their views of what constitutes wise economic or social policy.[18]

Under this long-established meaning of the Equal Protection Clause, it is clear that the Maryland maximum grant regulation is constitutionally valid. We need not explore all the reasons that the State advances in justification of the regulation. It is enough that a solid foundation for the regulation can be found in the State's legitimate interest in encouraging employment and in avoiding discrimination between welfare families and the families of the working poor. By combining a limit on the recipient's grant with permission to retain money earned, without reduction in the amount of the grant, Maryland provides an incentive to seek gainful employment. And by keying the maximum family AFDC grants to the minimum wage a steadily employed head of a household receives, the State maintains some semblance of an equitable balance between families on welfare and those supported by an employed breadwinner.[19]

It is true that in some AFDC families there may be no person who is employable.[20] It is also true that with respect to AFDC families whose determined standard of need is below the regulatory maximum, and who therefore receive grants equal to the determined standard, the employment incentive is absent. But the Equal Protection Clause does not require that a State must

---

[18] See Developments in the Law—Equal Protection, 82 Harv. L. Rev. 1065, 1082–1087.

[19] The present federal minimum wage is $52–$64 per 40-hour week, 29 U. S. C. § 206 (1964 ed., Supp. IV). The Maryland minimum wage is $46–$52 per week, Md. Ann. Code, Art. 100, § 83 (Supp. 1969).

[20] It appears that no family members of any of the named plaintiffs in the present case are employable.

choose between attacking every aspect of a problem or not attacking the problem at all. *Lindsley* v. *Natural Carbonic Gas Co.,* 220 U. S. 61. It is enough that the State's action be rationally based and free from invidious discrimination. The regulation before us meets that test.

We do not decide today that the Maryland regulation is wise, that it best fulfills the relevant social and economic objectives that Maryland might ideally espouse, or that a more just and humane system could not be devised. Conflicting claims of morality and intelligence are raised by opponents and proponents of almost every measure, certainly including the one before us. But the intractable economic, social, and even philosophical problems presented by public welfare assistance programs are not the business of this Court. The Constitution may impose certain procedural safeguards upon systems of welfare administration, *Goldberg* v. *Kelly, ante,* p. 254. But the Constitution does not empower this Court to second-guess state officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients. Cf. *Steward Mach. Co.* v. *Davis,* 301 U. S. 548, 584–585; *Helvering* v. *Davis,* 301 U. S. 619, 644.

*The judgment is reversed.*

[For Appendix, see *post,* p. 488.]

## APPENDIX TO OPINION OF THE COURT

The following was the schedule for determining subsistence needs, exclusive of rent, at the time this action was brought. Md. Manual of Dept. of Pub. Welfare, pt. II, Rule 200, Sched. A, p. 27:

STANDARD FOR DETERMINING COST OF SUBSISTENCE NEEDS

| Number of persons in assistance unit (include unborn child as an additional person) | I | II | III | IV | V |
|---|---|---|---|---|---|
| | Monthly costs when | | | | |
| | No heat or utilities included with shelter | Light and/ or cooking fuel included with shelter | Heat with or without light included with shelter | Heat, cooking fuel and water heating included with shelter | Heat and all utilities included with shelter |
| 1 person living: | | | | | |
|   Alone | $51.00 | $49.00 | $43.00 | $40.00 | $38.00 |
|   With 1 person | 42.00 | 41.00 | 38.00 | 36.00 | 35.00 |
|   With 2 persons | 38.00 | 37.00 | 35.00 | 34.00 | 33.00 |
|   With 3 or more persons | 36.00 | 35.00 | 34.00 | 33.00 | 32.00 |
| 2 persons living: | | | | | |
|   Alone | 84.00 | 82.00 | 76.00 | 72.00 | 70.00 |
|   With 1 other person | 76.00 | 74.00 | 70.00 | 68.00 | 66.00 |
|   With 2 or more other persons | 72.00 | 70.00 | 68.00 | 66.00 | 64.00 |
| 3 persons living: | | | | | |
|   Alone | 113.00 | 110.00 | 105.00 | 101.00 | 99.00 |
|   With 1 or more other persons | 108.00 | 106.00 | 101.00 | 99.00 | 97.00 |
| 4 persons | 143.00 | 140.00 | 135.00 | 131.00 | 128.00 |
| 5 persons | 164.00 | 162.00 | 156.00 | 152.00 | 150.00 |
| 6 persons | 184.00 | 181.00 | 176.00 | 172.00 | 169.00 |
| 7 persons | 209.00 | 205.00 | 201.00 | 197.00 | 193.00 |
| 8 persons | 235.00 | 231.00 | 227.00 | 222.00 | 219.00 |
| 9 persons | 259.00 | 256.00 | 251.00 | 247.00 | 244.00 |
| 10 persons | 284.00 | 281.00 | 276.00 | 271.00 | 268.00 |
| Each additional person over 10 persons | 24.50 | 24.50 | 24.50 | 24.50 | 24.50 |

Modification of standard for cost of eating in restaurant: Add $15 per individual.

Other schedules set the estimated cost of shelter in the various counties in Maryland. See id., Sched. B—Plan A, p. 29; Sched. B—Plan B, p. 30. The present schedules, which are substantially the same, appear in the Md. Manual of Dept. of Social Services, Rule 200, pp. 33, 35.

MR. JUSTICE BLACK, with whom THE CHIEF JUSTICE joins, concurring.

Assuming, as the Court apparently does, that individual welfare recipients can bring an action against state welfare authorities challenging an aspect of the State's welfare plan as inconsistent with the provisions of the Social Security Act, 42 U. S. C. §§ 601–610 (1964 ed. and Supp. IV), even though the Secretary of Health, Education, and Welfare has determined as he has here that the federal and state provisions are consistent, cf. *Rosado* v. *Wyman, ante,* p. 430 (BLACK, J., dissenting), I join in the opinion of the Court in this case.

MR. JUSTICE HARLAN, concurring.

I join the Court's opinion, with one reservation which I deem called for by certain implications that might be drawn from the opinion.

As I stated in dissent in *Shapiro* v. *Thompson,* 394 U. S. 618, 658–663 (1969), I find no solid basis for the doctrine there expounded that certain statutory classifications will be held to deny equal protection unless justified by a "compelling" governmental interest, while others will pass muster if they meet traditional equal protection standards. See also my dissenting opinion in *Katzenbach* v. *Morgan,* 384 U. S. 641, 660–661 (1966). Except with respect to racial classifications, to which unique historical considerations apply, see *Shapiro,* at 659, I believe the constitutional provisions assuring equal protection of the laws impose a standard of rationality of classification, long applied in the decisions of this Court, that does not depend upon the nature of the classification or interest involved.

It is on this basis, and not because this case involves only interests in "the area of economics and social welfare," *ante,* at 485, that I join the Court's constitutional holding.

MR. JUSTICE DOUGLAS, dissenting.

Appellees, recipients of benefits under the Aid to Families With Dependent Children (AFDC) program, brought this suit under 42 U. S. C. § 1983 to have declared invalid and permanently enjoined the enforcement of the Maryland maximum grant regulation, which places a ceiling on the amount of benefits payable to a family under AFDC. They alleged that the regulation was inconsistent with the Social Security Act and that it denied equal protection of the laws in violation of the Fourteenth Amendment. I do not find it necessary to reach the constitutional argument in this case, for in my view the Maryland regulation is inconsistent with the terms and purposes of the Social Security Act.

The Maryland regulation under attack, Rule 200, § X, B, of the Maryland Department of Social Services, places an absolute limit of $250 per month on the amount of a grant under AFDC, regardless of the size of the family and its actual need.[1] The effect of this regulation is to deny benefits to additional children born into a family of six, thus making it impossible for families of seven persons or more to receive an amount commensurate with their actual need in accordance with standards formulated by the Maryland Department of Social Services, whereas families of six or less can receive the full amount of their need as so determined. Appellee Williams, according to the computed need for herself and her eight

---

[1] In certain counties the applicable maximum grant is $240 per month. All of the appellees in this case are residents of Baltimore City, where the $250-per-month maximum grant applies.

children, should receive $296.15 per month. Appellees Gary should receive $331.50 for themselves and their eight children. Instead, these appellees received the $250 maximum grant.

In *King* v. *Smith*, 392 U. S. 309, 318–319, this Court stated: "There is no question that States have considerable latitude in allocating their AFDC resources, since each State is free to set its own standard of need and to determine the level of benefits by the amount of funds it devotes to the program." That dictum, made in the context of a case that dealt with Alabama's "substitute father" regulation, does little to clarify the limits of state authority. The holding in *King* was that the Alabama regulation, which denied AFDC benefits to the children of a mother who "cohabited" in or outside her home with an able-bodied man, was invalid because it defined "parent" in a manner inconsistent with § 406 (a) of the Social Security Act, 42 U. S. C. § 606 (a) (1964 ed., Supp. IV). The Court rejected the State's contention that its regulation was "a legitimate way of allocating its limited resources available for AFDC assistance." 392 U. S., at 318. Thus, whatever else may be said of the "latitude" extended to States in determining the benefits payable under AFDC, the holding in *King* makes clear that it does not include restrictions on the payment of benefits that are incompatible with the Social Security Act.

The methods by which a State can limit AFDC payments below the level of need are numerous. The method used in *King* was to deny totally benefits to a specifically defined class of otherwise eligible recipients. Another method, which was disapproved by Congress in § 402 (a)(10) of the Social Security Act, 42 U. S. C. § 602 (a)(10) (1964 ed., Supp. IV), was to refuse to take additional applications pending a decrease in the number of recipients on the assistance rolls or an increase in available funds. The two methods most commonly em-

ployed by the States at present, however, are percentage reductions and grant maximums. See Department of Health, Education, and Welfare (HEW), State Maximums and Other Methods of Limiting Money Payments to Recipients of the Special Types of Public Assistance, Oct. 1968, Tables 2, 3 (NCSS Report D–3). Grant maximums, in which payments are made according to need but subject to a stated dollar maximum, are of two types: individual maximums and family maximums. Only the latter type is at issue in the present case. Percentage reductions involve payments of a fixed percentage of actual need as determined by the State's need standard.

The authority given the States to set the level of benefits payable under their AFDC plans stems from § 401 of the Social Security Act, 42 U. S. C. § 601 (1964 ed., Supp. IV), which states the purpose of the federal AFDC appropriations as "enabling each State to furnish financial assistance and rehabilitation and other services, *as far as practicable under the conditions in such State* . . . ." (Emphasis added.) It is significant in this respect that the Court in *King* referred only to a State's determination of the level of benefits *"by the amount of funds it devotes to the* [AFDC] *program."* 392 U. S., at 318–319 (emphasis added). The language of § 401 and the language of the Court in *King* both reflect a concern that the Federal Government not require a state legislature to appropriate more money for welfare purposes than it is willing and able to appropriate. The use of the matching formula in § 403 of the Act, 42 U. S. C. § 603 (1964 ed., Supp. IV), supports this deference to the fiscal decisions of state legislatures. The question of a State's authority to pay less than its standard of need, however, has never been expressly decided.

Assuming, *arguendo,* that a State need not appropriate sufficient funds to pay all eligible AFDC recipients the

full amount of their need, it does not follow that it can distribute such funds as it deems appropriate in a manner inconsistent with the Social Security Act. The question involved here is not one of ends; it is one of means. Thus the United States Government, in its Memorandum as Amicus Curiae in *Rosado* v. *Wyman*, decided this day, *ante*, p. 397, stated, at 6–7:

> "Maximums, whether so many dollars per individual or a total number of dollars per family, have an arbitrary aspect lacking from ratable reductions, since their application means that one family or individual will receive a smaller proportion of the amounts he is determined to need under the state's test than another family or individual. Where percentage reductions are used, the payment of every family is reduced proportionately . . . . [T]his aspect explains why Congress might wish to distinguish between maximums and ratable reductions as a means of reducing a state's financial obligation and, at least inferentially, to disfavor the former."

The District Court, in its initial ruling that the Maryland regulation was inconsistent with the Social Security Act, relied primarily on § 402 (a)(10) of the Act, which provides that "all individuals wishing to make application for aid to families with dependent children shall have opportunity to do so, and that aid to [families with] dependent children shall be furnished with reasonable promptness *to all eligible individuals.*" 42 U. S. C. § 602 (a)(10) (1964 ed., Supp. IV). (Emphasis added.) This provision was added by the Social Security Act Amendments of 1950, 64 Stat. 549. The House Committee on Ways and Means, where the provision originated, explained its purpose as follows:

> "Shortage of funds in aid to dependent children has sometimes, as in old-age assistance, resulted in

> a decision not to take more applications or to keep eligible families on waiting lists until enough recipients could be removed from the assistance rolls to make a place for them. . . . [T]his difference in treatment accorded to eligible people results in undue hardship on needy persons and is inappropriate in a program financed from Federal funds."

H. R. Rep. No. 1300, 81st Cong., 1st Sess., 48 (1949).

In the court below, the appellants relied upon this legislative history to argue that the "eligible individuals" to whom aid must be furnished are the applicants for aid referred to in the beginning of the provision, and not the individual members of a family unit. I find nothing in the Act or in the legislative history of § 402 (a)(10) which supports that argument.

The purpose of the AFDC program, as stated in the Act, is to encourage "the care of dependent children in their own homes or in the homes of relatives by enabling each State to furnish financial assistance and rehabilitation and other services, as far as practicable under the conditions in such State, *to needy dependent children and the parents or relatives with whom they are living* to help maintain and strengthen family life . . . ." Social Security Act § 401, 42 U. S. C. § 601 (1964 ed., Supp. IV) (emphasis added). The terms "dependent child" and "relative with whom any dependent child is living" are defined in § 406 of the Act, 42 U. S. C. § 606 (1964 ed., Supp. IV).

The aid provided through the AFDC program has always been intended for the individual dependent children, not for those who apply for the aid on their behalf. The Senate Committee on Finance, in its report on the Social Security Bill of 1935, stated this purpose in the following terms:

> "The heart of any program for social security must be the child. All parts of the Social Security

Act are in a very real sense measures for the security of children. . . .

"In addition, however, there is great need for special safeguards for many underprivileged children. Children are in many respects the worst victims of the depression. . . .

"Many of the children included in relief families present no other problem than that of providing work for the breadwinner of the family. These children will be benefited through the work relief program and still more through the revival of private industry. But there are large numbers of children in relief families which will not be benefited through work programs or the revival of industry.

"These are the children in families which have been deprived of a father's support and in which there is no other adult than one who is needed for the care of the children. . . .

"With no income coming in, and with young children for whom provision must be made for a number of years, families without a father's support require public assistance, unless they have been left with adequate means or are aided by friends and relatives. . . . *Through cash grants adjusted to the needs of the family it is possible to keep the young children with their mother in their own home, thus preventing the necessity of placing the children in institutions.* This is recognized by everyone to be the least expensive and altogether the most desirable method for meeting the needs of these families that has yet been devised." S. Rep. No. 628, 74th Cong., 1st Sess.; 16–17 (1935) (emphasis added).

Prior to 1950, no specific provision was made for the need of the parent or other relative with whom the dependent child was living. Although this underscores

the fact that the payments were intended to benefit the children and not the applicants who received those payments, the exclusion from the federal scheme of provision for the need of the caring relative operated effectively to dilute the ability of the AFDC payments to meet the need of the child. To correct this latter deficiency, the 1950 Amendments allowed provision for the needs of this caring relative. The Report of the House Committee on Ways and Means stated:

> "Particularly in families with small children, it is necessary for the mother or another adult to be in the home full time to provide proper care and supervision. Since the person caring for the child must have food, clothing, and other essentials, amounts allotted to the children must be used in part for this purpose if no other provision is made to meet her needs. . . .
>
> .    .    .    .    .
>
> "To correct the present anomalous situation wherein no provision is made for the adult relative and to enable States to make payments that are more nearly adequate, the bill would include the relative with whom the dependent child is living as a recipient for Federal matching purposes. . . ."

H. R. Rep. No. 1300, 81st Cong., 1st Sess., 46 (1949).

This amendment emphasizes the congressional concern with fully meeting the needs of the dependent children in a given family; and it would seem to negative the necessity of those children sharing their individual allocations with other essential members of the family unit.

There is other evidence that Congress intended each eligible recipient to receive his fair share of benefits under the AFDC program. The Public Welfare Amendments of 1962 provided that a state AFDC plan must "provide for the development and application of a pro-

gram for [services to maintain and strengthen family life] *for each child* who receives aid to families with dependent children . . . ." 42 U. S. C. § 602 (a)(13). The Social Security Amendments of 1967, which extended this program of "family services" to relatives receiving AFDC payments and "essential persons" living in the same home as the child and relative, retained the emphasis on providing these services to *"each* appropriate individual." Social Security Act, §§ 402 (a)(14), (15), 42 U. S. C. §§ 602 (a)(14), (15) (1964 ed., Supp. IV). The Senate Finance Committee Report on the 1967 Amendments stated:

"Under the Social Security Act Amendments of 1962, an amendment was added to title IV requiring the State welfare agency to make a program for each child, identifying the services needed, and then to provide the necessary services. This has proven a useful amendment, for it has required the States to give attention to the children and to provide services necessary to carry out the plans for the individual child. . . . [T]he committee believes that it is essential to broaden the requirement for the program of services for each child to include the entire family. The committee bill would require, therefore, that the States establish a social services program for each AFDC family. Thus there will be a broadened emphasis to include a recognition of the needs of all members of the family, including 'essential persons.' " S. Rep. No. 744, 90th Cong., 1st Sess., 155 (1967).

These "family services" provisions are helpful in interpreting the words "all eligible individuals" in § 402 (a)(10) of the Act for they reveal Congress' overriding concern with meeting the needs of each eligible recipient of aid under the AFDC program. The resources com-

manded to meet those needs, as well as the definition of those individuals eligible to receive this aid, have expanded over the years. At first, only financial assistance was available. Now "family services" programs have been added.[2] In each case, however, the concern has been with meeting the needs of each eligible recipient.

[2] The benefits distributed under the AFDC program include "financial assistance and rehabilitation and other services." Social Security Act § 401. The term "aid to families with dependent children" is itself defined in § 406 (b) of the Act, as "money payments with respect to, or . . . medical care in behalf of or any type of remedial care recognized under State law" in behalf of dependent children, the relatives with whom they live, and other "essential persons" residing with the relative and child.

The services provided by the Act for AFDC recipients include "family services" and "child-welfare services." "Family services" are defined by § 406 (d) of the Act, as "services to a family or any member thereof for the purpose of preserving, rehabilitating, reuniting, or strengthening the family, and such other services as will assist members of a family to attain or retain capability for the maximum self-support and personal independence." "Child-welfare programs" are defined by § 425 of the Act, 42 U. S. C. § 625 (1964 ed., Supp. IV), as "public social services which supplement, or substitute for, parental care and supervision for the purpose of (1) preventing or remedying, or assisting in the solution of problems which may result in, the neglect, abuse, exploitation, or delinquency of children, (2) protecting and caring for homeless, dependent, or neglected children, (3) protecting and promoting the welfare of children of working mothers, and (4) otherwise protecting and promoting the welfare of children, including the strengthening of their own homes where possible or, where needed, the provision of adequate care of children away from their homes in foster family homes or day-care or other child-care facilities." In addition, § 402 (a) (15) of the Act requires the State AFDC plan to provide for the development of a program for each appropriate relative and dependent child receiving aid under the plan, and other "essential persons" living with a relative and child receiving such aid, "with the objective of—(i) assuring, to the maximum extent possible, that such relative, child, and individual will enter the labor force and accept employment so that they will become self-sufficient, and (ii) preventing or reducing the

A further indication that the phrase "all eligible individuals" as used in § 402 (a)(10) refers to the individual beneficiaries of aid, and not those who apply for and receive the payments, lies in the provisions of the Act that concern the computation of federal payments to the States. Social Security Act § 403. These payments are presently computed in relation to the State's contribution to individual recipients, with federal payment of five-sixths of the first $18 a month per recipient of state expenditure, and further payment up to a maximum of $32 a month per recipient. There is no limitation on federal payments based on family size in the present provisions, nor has there ever been such a limitation in previous versions of the Act.

Section 403 (d)(1) of the Act imposes a limitation on federal payments to States as respects children whose eligibility is based upon the absence from the home of a parent. Under this section, the number of AFDC children under the age of 18 for whom federal sharing is available cannot exceed the ratio of AFDC children eligible because of an "absent parent" to the total child

---

incidence of births out of wedlock and otherwise strengthening family life . . . ."

Section 432 of the Act, 42 U. S. C. § 632 (1964 ed., Supp. IV), provides for the establishment of work-incentive programs for AFDC recipients which include the placement of recipients over the age of 16 in employment, "institutional and work experience training for those individuals for whom such training is likely to lead to regular employment," and "special work projects for individuals for whom a job in the regular economy cannot be found." See also Social Security Act § 402 (a)(19).

The State must also provide foster care in accordance with § 408 of the Act. See Social Security Act § 402 (a)(20). And whenever the State feels that AFDC payments may not be used in the best interests of the child, it may provide for counseling or guidance with respect to the use of such payments and the management of other funds. Social Security Act § 405, 42 U. S. C. § 605.

population of a State as of January 1, 1968. Appellants have argued that this limitation somehow indicates congressional approval of the maximum grant concept. The District Court below properly rejected that contention. The Report of the House Committee on Ways and Means indicates that the purpose of the limitation is to keep federal financial participation "within reasonable bounds" and to "give the States an incentive to make effective use of the constructive programs which the bill would establish." H. R. Rep. No. 544, 90th Cong., 1st Sess., 110. Keeping federal participation "within reasonable bounds" was tied to the fact that the "absent parent" category of AFDC recipients was the one that was growing most rapidly. *Ibid.* This provision, however, relates only to federal contributions to a State's AFDC program, and does not authorize the State's termination of aid to any of the children who would otherwise be eligible for aid because of an absent parent. Representative Mills explained the purpose of this limitation to the House in the following terms:

> "Finally, Mr. Chairman, the bill would add a provision to present law which would limit Federal financing for the largest AFDC category—where the parent is absent from the home—to the proportion of each State's total child population that is now receiving AFDC in this category. This provision, we believe, would give the States an additional incentive to make effective use of the constructive programs which the bill would establish. Moreover, this limitation on Federal matching will not prevent any deserving family from receiving aid payments. The States would not be free to keep any family off the rolls to keep within this limitation because there is a requirement in the law that requires equal

treatment of recipients and uniform administration of a program within a State. . . ." 113 Cong. Rec. 23055.

In sum, the provisions of the Act that compute the amount of federal contribution to state AFDC programs are related to state payments to individual recipients and have consistently excluded any limitation based upon family size. The limitation contained in § 403 (d)(1) of the Act affects only the amount of federal matching funds in one category of aid, and in no way indicates congressional approval of maximum grants.

The purpose of the AFDC provisions of the Social Security Act is not only to provide for the needs of dependent children but also "to keep the young children with their mother in their own home, thus preventing the necessity of placing the children in institutions." S. Rep. No. 628, 74th Cong., 1st Sess., 17 (1935). Also see Social Security Act § 401. As the District Court noted, however, "the maximum grant regulation provides a powerful economic incentive to break up large families by placing 'dependent children' in excess of those whose subsistence needs, when added to the subsistence needs of other members of the family, exceed the maximum grant, in the homes of persons included in the class of eligible relatives." 297 F. Supp., at 456. By this device, payments for the "excess" children can be obtained.

> "If Mrs. Williams were to place two of her children of twelve years or over with relatives, each child so placed would be eligible for assistance in the amount of $79.00 per month, and she and her six remaining children would still be eligible to receive the maximum grant of $250.00. If Mr. and

Mrs. Gary were to place two of their children between the ages of six and twelve with relatives, each child so placed would be eligible for assistance in the amount of $65.00 per month, and they and their six remaining children would still be eligible to receive the maximum grant of $250.00." *Id.,* at 453–454.

The District Court correctly states that this incentive to break up family units created by the maximum grant regulation is in conflict with a fundamental purpose of the Act.

The history of the Social Security Act thus indicates that Congress intended the financial benefits, as well as the other benefits, of the AFDC program to reach each individual recipient eligible under the federal criteria. It was to this purpose that Congress had reference when it commanded in § 402 (a)(10) of the Act that aid to families with dependent children shall be furnished to "all eligible individuals."

The Court attempts to avoid the effect of this command by stating that "it is the *family* grant that is affected." *Ante,* at 477–478. The implication is that, regardless of how the AFDC payments are computed or to whom they apply, the payments will be used by the parents for the benefit of all the members of the family unit. This is no doubt true. But the fact that parents may take portions of the payments intended for certain children to give to other children who are not given payments under the State's AFDC plan, does not alter the fact that aid is not being given *by the State* to the latter children. And it is payments by the State, not by the parents, to which the command of § 402 (a)(10) is directed. The Court's argument would equate family

grant maximums with percentage reductions, but the two are, in fact, quite distinct devices for limiting welfare payments. If Congress wished to design a scheme under which each family received equal payments, irrespective of the size of the family, I see nothing that would prevent it from doing so. But that is not the scheme of Congress under the present Act.

Against the legislative history and the command of § 402 (a)(10), the appellants cite three provisions of the Social Security Act as recognizing the validity of state maximum grant regulations.

The first of these provisions is § 402 (a)(23) of the Act, 42 U. S. C. § 602 (a)(23) (1964 ed., Supp. IV), which provides:

> "[A State plan for aid and services to needy families with children must] provide that by July 1, 1969, the amounts used by the State to determine the needs of individuals will have been adjusted to reflect fully changes in living costs since such amounts were established, and any maximums that the State imposes on the amount of aid paid to families will have been proportionately adjusted."

This section had its genesis in an Administration proposal to require States to pay fully the amounts required by their standard of need, and also to make cost-of-living adjustments to that standard of need by July 1, 1968, and annually thereafter. Hearings on H. R. 5710 before the House Committee on Ways and Means, 90th Cong., 1st Sess., pt. 1, p. 59 (1967); House Committee on Ways and Means, Section-by-Section Analysis and Explanation of Provisions of H. R. 5710, 90th Cong., 1st Sess., 36 (Comm. Print) (1967). The bill that emerged from the House as H. R. 12080, however, did not include any provision relating to an increase in benefit levels or

adjustments to standards of need. See Hearings on H. R. 12080 before the Senate Committee on Finance, 90th Cong., 1st Sess., pt. 1, pp. 109–144 (1967). A provision requiring a cost-of-living adjustment in the standard of need by July 1, 1969, and annually thereafter was added to the House bill by the Senate Finance Committee, and this provision also required that "any maximums . . . on the amount of aid" be proportionately adjusted. S. Rep. No. 744, 90th Cong., 1st Sess., 293 (1967). An amendment of the bill was proposed in the Senate that would have required a positive increase in AFDC payments, but that amendment was rejected. 113 Cong. Rec. 33560. The Senate-House Conference Committee adopted the Senate AFDC cost-of-living provision, omitting only the requirement for annual updating of need standards after July 1, 1969. H. R. Conf. Rep. No. 1030, 90th Cong., 1st Sess., 63 (1967).

Nowhere in any of the hearings, committee reports, or floor debates, is there shown a congressional intent to validate state maximum grant regulations by the provisions of § 402 (a)(23). Rather, the legislative history shows that Congress was exclusively concerned with increasing the income of AFDC recipients. If Congress had not required cost-of-living adjustments in state-imposed grant maximums, the States could easily nullify the effect of the cost-of-living adjustments for many AFDC families by retaining the grant ceilings in force before the adjustment was made. Congress was, to be sure, acknowledging the existence of maximum grant regulations. But every congressional reference to an existing practice does not automatically imply approval of that practice. The task of statutory construction requires more. It requires courts to look to the context of that reference, and to the history of relevant legislation. In the present context, the reference to maximum

grants was necessary to preserve the integrity of the cost-of-living adjustment required by the bill. No further significance can legitimately be read into that reference.

Appellants also rely on § 108 (a) of Pub. L. 87–543, 76 Stat. 189, a provision of the Public Welfare Amendments of 1962 that amended § 406 of the Act. This amendment, which has since been superseded, authorized "protective payments" to an individual other than the relative with whom the dependent child is living. The problem which this amendment was designed ·to cure was that some payees were unable to manage their funds so that the dependent children received the full benefit of the AFDC payments. Hearings on H. R. 10606 before the Senate Committee on Finance, 87th Cong., 2d Sess., 137 (1962). The House bill required "a meeting of all need as determined by the State" as a condition to including "protective payments" within the definition of "aid to families with dependent children." The Senate Finance Committee changed that requirement, however, by an amendment which authorized federal funding of "protective payments" if the state-determined need of individuals with respect to whom such payments were made was fully met by their assistance payment and other income or resources. The Senate Committee explained this provision as follows:

> "The effect of this provision is to make it possible for protective payments to be made in behalf of certain ADC recipients in States in which there is a maximum limiting the amount of assistance an individual may receive. These are the cases in which the statutory maximum does not prevent need from being met in full according to the State's standards." S. Rep. No. 1589, 87th Cong., 2d Sess., 14 (1962).

This reference to a state-imposed maximum can hardly be interpreted as a congressional approval of a family maximum grant. If anything, it implicitly disapproves the concept by withholding federal payments with respect to individuals receiving "protective payments" when a maximum grant operates to prevent these individuals from receiving the full amount of their state-determined need.

The final statutory provision relied upon by appellants is § 220 (a) of Pub. L. 90–248, 81 Stat. 898, which added to the Medical Assistance Title of the Act a new § 1903 (f), 42 U. S. C. § 1396b (f) (1964 ed., Supp. IV). This section limits federal financial participation in medical assistance benefits to those whose incomes do not exceed 133⅓% of the highest amount of AFDC assistance paid to a family of the same size without any income or resources. This section, however, also provides: "If the Secretary [of HEW] finds that the operation of a uniform maximum limits payments to families of more than one size, he may adjust the amount otherwise determined . . . to take account of families of different sizes." The purpose of this provision was to allow qualification as medically indigent of those individuals who would have qualified but for the operation of an AFDC grant maximum, and thus prevent the extension of the operation of grant maximums into the Medical Assistance Title. Congressional rejection of grant maximums in the Medical Assistance Title does not infer their approval in the context of the AFDC provisions. Quite the contrary would seem to be the case.

In all of the legislative provisions relied upon by the appellants, the congressional reference to maximum grants has been made in the context of attempting to alleviate the harsh results of their application, not in a context of approving and supporting their operation. The three statutory references cited by appellants and

discussed above are clearly inadequate to overcome the long history of concern manifested in the AFDC provisions of the Social Security Act for meeting the needs of each eligible recipient, and the command of § 402 (a) (10) of the Act to that effect.

Appellants tender one further argument as to the compliance of the Maryland maximum grant regulation with the Social Security Act. That argument is that the Department of Health, Education, and Welfare has not disapproved of any of the Maryland plans that have included maximum grant provisions, and that this lack of disapproval by HEW is a binding administrative determination as to the conformity of the regulation with the Social Security Act. That argument was thoroughly explored by the District Court below in its supplemental opinion. The District Court accepted the claim that HEW considers the Maryland maximum grant regulation not to be violative of the Act, but held:

> "In view of the fact, however, that there is no indication from administrative decision, promulgated regulation, or departmental statement that the question of the conformity of maximum grants to the Act has been given considered treatment, we believe that the various actions and inactions on the part of HEW are not entitled to substantial, much less to decisive, weight in our consideration of the instant case." 297 F. Supp., at 460.

HEW seldom has formally challenged the compliance of a state welfare plan with the terms of the Social Security Act. See Note, Federal Judicial Review of State Welfare Practices, 67 Col. L. Rev. 84, 91 (1967). The mere absence of such a formal challenge, whatever may be said for its constituting an affirmative determination of the compliance of a state plan with the Social Security Act, is not such a determination as is entitled to

decisive weight in the judicial determination of this question.

On the basis of the inconsistency of the Maryland maximum grant regulation with the Social Security Act, I would affirm the judgment below.

MR. JUSTICE MARSHALL, whom MR. JUSTICE BRENNAN joins, dissenting.

For the reasons stated by MR. JUSTICE DOUGLAS, to which I add some comments of my own, I believe that the Court has erroneously concluded that Maryland's maximum grant regulation is consistent with the federal statute. In my view, that regulation is fundamentally in conflict with the basic structure and purposes of the Social Security Act.

More important in the long run than this misreading of a federal statute, however, is the Court's emasculation of the Equal Protection Clause as a constitutional principle applicable to the area of social welfare administration. The Court holds today that regardless of the arbitrariness of a classification it must be sustained if any state goal can be imagined that is arguably furthered by its effects. This is so even though the classification's underinclusiveness or overinclusiveness clearly demonstrates that its actual basis is something other than that asserted by the State, and even though the relationship between the classification and the state interests which it purports to serve is so tenuous that it could not seriously be maintained that the classification tends to accomplish the ascribed goals.

The Court recognizes, as it must, that this case involves "the most basic economic needs of impoverished human beings," and that there is therefore a "dramatically real factual difference" between the instant case and those decisions upon which the Court relies. The acknowledgment that these dramatic differences exist is

a candid recognition that the Court's decision today is wholly without precedent. I cannot subscribe to the Court's sweeping refusal to accord the Equal Protection Clause any role in this entire area of the law, and I therefore dissent from both parts of the Court's decision.

I

At the outset, it should be emphasized exactly what is involved in determining whether this maximum grant regulation is consistent with and valid under the federal law. In administering its AFDC program, Maryland has established its own standards of need, and they are not under challenge in this litigation. Indeed, the District Court specifically refused to require additional appropriations on the part of the State or to permit appellees to recover a monetary judgment against the State. At the same time, however, there is no contention, nor could there be any, that the maximum grant regulation is in any manner related to calculation of need.[1] Rather, it arbitrarily cuts across state-defined standards of need to deny any additional assistance with respect to the fifth or any succeeding child in a family.[2] In short, the regulation represents no less than the refusal of the State to give any aid whatsoever for the support of certain dependent children who meet the standards of need that the State itself has established.

---

[1] The Court is thus wrong in speaking of "the greater ability of large families—because of the inherent economies of scale—to accommodate their needs to diminished per capita payments." Those economies have already been taken into account once in calculating the standard of need. Indeed, it borders on the ludicrous to suggest that a large family is more capable of living on perhaps 50% of its standard of need than a small family is on 95%.

[2] Because of minor variations in the calculation of the subsistence needs of particular families, and because the maximum grant varies between $240 and $250 per month, depending upon the county in which a particular family resides, the cutoff point between families that receive the full subsistence allowance and those that do not

Since its inception in the Social Security Act of 1935, the focus of the federal AFDC program has been to provide benefits for the support of dependent children of needy families with a view toward maintaining and strengthening family life within the family unit. As succinctly stated by the Senate Committee on Finance, "[t]he objective of the aid to dependent children program is to provide cash assistance for needy children *in their own homes.*"[3] In meeting these objectives, moreover, Congress has provided the outlines that the AFDC plan is to follow if a State should choose to participate in the federal program. The maximum grant regulation, however, does not fall within these outlines or accord with the purposes of the Act. And the Court by approving it allows for a complete departure from the congressional intent.

The phrase "aid to families with dependent children," from which the AFDC program derives its name, appears in § 402 (a)(10) of the Act, 42 U. S. C. § 602 (a)(10) (1964 ed., Supp. IV), and is defined in 42 U. S. C. § 606 (b) (1964 ed., Supp. IV) as, *inter alia,* "money payments *with respect to* . . . dependent children." (Emphasis added.) Moreover, the term "dependent child" is also extensively defined in the Act. See 42 U. S. C. § 606 (a) (1964 ed., Supp. IV). Nowhere in the Act is there any sanction or authority for the State to alter those definitions—that is, to select arbitrarily from among the

---

is not precisely families of more than six members. In practice, it appears that the subsistence needs of a family of six members are fully met. The needs of the seventh member (*i. e.,* the fifth or sixth child, depending upon whether one or both parents are within the assistance unit), as defined by the State are met, if at all, only to a very small extent. In the usual situation, no payments whatever would be made with respect to any additional eligible dependent children.

[3] S. Rep. No. 165, 87th Cong., 1st Sess., 6 (1961). (Emphasis added.)

class of needy dependent children those whom it will aid. Yet the clear effect of the maximum grant regulation is to do just that, for the regulation creates in effect a class of otherwise eligible dependent children with respect to whom no assistance is granted.

It was to disapprove just such an arbitrary device to limit AFDC payments that Congress amended § 402 (a)(10) in 1950 to provide that aid "shall be furnished with reasonable promptness *to all eligible individuals.*" (Emphasis added.) Surely, as my Brother Douglas demonstrates, this statutory language means at least that the State must take into account the needs of, and provide aid with respect to, *all* needy dependent children. Indeed, that was our assessment of the congressional design embodied in the AFDC program in *King* v. *Smith,* 392 U. S. 309, 329–330, 333 (1968).

The opinion of the Court attempts to avoid this reading of the statutory mandate by the conclusion that parents will see that all the children in a large family share in whatever resources are available so that all children "do receive some aid." And "[s]o long as some aid is provided to all eligible families and all eligible children, the statute itself is not violated." The Court also views sympathetically the State's contention that the "all eligible individuals" clause was designed solely to prevent discrimination against new applicants for AFDC benefits. I am unpersuaded, however, by the view that Congress simultaneously prohibited discrimination against one class of dependent children—those in families not presently receiving benefits—and at the same time sanctioned discrimination against another class— those children in large families. Furthermore, the Court's interpretation would permit a State to impose a drastically reduced maximum grant limitation—or, indeed, a uniform payment of, say, $25 per family per month—as long as all families were subject to the rule.

Thus, merely by purporting to compute standards of need and granting some benefits to all eligible families, the State would comply with the federal law—in spite of the fact that the needs of no or very few dependent children would thereby be taken into account in the actual assistance granted. I cannot agree that Congress intended that a State should be entitled to participate in the federally funded AFDC program under such circumstances.

Moreover, the practical consequences of the maximum grant regulation in question here confirm my view that it is invalid. Under the complicated formula for determining the extent of federal support for the AFDC program in the various States, the federal subsidy is based upon "the total number of recipients of aid to families with dependent children." 42 U. S. C. § 603 (a) (1964 ed., Supp. IV). "Recipients" is defined in the same provision to include both dependent children and the eligible relative or relatives with whom they live. There is, however, no limitation upon the number of recipients per family unit for whom the federal subsidy is paid to the States. Thus, when a maximum family grant regulation is in effect, the State continues to receive a federal subsidy for each and every dependent child even though the State passes *none* of this subsidy on to the large families for the use of the additional dependent children.

Specifically, in Maryland, the record in this case indicates that the State spends an average of almost $40 per recipient per month. Under the federal matching formula, federal funds provide $22 of the first $32 per recipient, with anything above $32 being supplied by the State.[4] However, the Federal Government provides a

---

[4] More technically, the Federal Government supplies five-sixths of the overall amount spent per recipient up to $18, plus one-half of the amount from $18 to $32, to a total of $22. See 42 U. S. C. § 603 (1964 ed., Supp. IV).

maximum of $22 for every dependent child, although none of that amount is received by the needy family in the case of the fifth or sixth and succeeding children. The effect is to shift a greater proportion of the support of large families from the State to the Federal Government as the family size increases. Indeed, if the size of the family should exceed 11, the State would succeed in transferring the entire support burden for the family to the Federal Government, and even make a "profit" in the sense that it would receive more from the Federal Government with respect to the family than the $250 maximum that is actually paid to that family. It is impossible to conclude that Congress intended so incongruous a result. On the contrary, when Congress undertook to subsidize payments on behalf of *each recipient*—including each dependent child—it seems clear that Congress intended each needy dependent child to receive the use and benefit of at least the incremental amount of the federal subsidy paid on his account.

A second effect of the maximum family grant regulation further demonstrates its inconsistency with the federal program. As administered in Maryland, the regulation serves to provide a strong economic incentive to the disintegration of large families. This is so because a family subject to the maximum regulation can, merely by placing the ineligible children in the homes of other relatives, receive additional monthly payments for the support of these additional dependent children.[5] When families are receiving support that is concededly far below their bare minimum subsistence needs, the economic incentive that the maximum grant regulation provides to divide up large families can hardly be viewed as speculative or negligible. The opinion of this Court

---

[5] For example, in the case of the appellee Mrs. Williams, if she were to place two of her children over 12 years of age with relatives, payments of $79 per month would be paid with respect to each

does not even dispute this effect.[6] The Court answers by saying that the family relationship "may be attenuated but it cannot be destroyed." Yet it was just this kind of attenuation that, as the legislative history conclusively demonstrates,[7] Congress was concerned with eliminating in establishing the AFDC program. The Court's rationale takes a long step backwards toward the time when persons were dependent upon the charity of their relatives—the very situation meant to be remedied by AFDC.

child. Thus, a total of $408 per month, or $158 above the maximum, would be available for the support of Mrs. Williams and her eight children. Similarly, if appellees Mr. and Mrs. Gary were to place with relatives two of their children who are between the ages of 6 and 12 years, each child would be eligible to receive $65. Hence Mr. and Mrs. Gary and their eight children would receive support in the amount of $380 per month, or some $130 above the family maximum.

[6] The State has contended that the economic incentive to the disintegration of large families that the maximum grant regulation provides is merely speculative. However, serious doubt is cast upon this view by the stipulation of facts entered in the District Court which states in part that, despite the strong desire to keep their families together, appellees in this case were having great difficulty in doing so because of the limitations on their grants.

[7] In S. Rep. No. 628, 74th Cong., 1st Sess., 17 (1935), the original goals of the AFDC program are stated as follows: "With no income coming in, and with young children for whom provision must be made for a number of years, families without a father's support require public assistance, unless they have been left with adequate means or are aided by friends and relatives. . . . Through cash grants *adjusted to the needs of the family* it is possible to keep the young children *with their mother in their own home,* thus preventing the necessity of placing the children in institutions. This is recognized by everyone to be the least expensive and altogether the most desirable method for meeting the needs of these families that has yet been devised." (Emphasis added.) See also H. R. Rep. No. 615, 74th Cong., 1st Sess., 10 (1935).

These goals remain the same today. See 42 U. S. C. § 601 (1964 ed., Supp. IV). See generally Note, Welfare's "Condition X," 76 Yale L. J. 1222, 1232–1233 (1967).

Despite its denial of the principle that payments should be made with regard to all eligible individuals and its conflict with the basic purposes of the Act, the Maryland regulation is nevertheless found by the Court to be consistent with the federal law because the existence of such regulations has been recognized by Congress. To bolster this view, the Court argues that the same conclusion has been reached by the department charged with administering the Act. On neither score is the Court convincing.

With regard to the position of the Secretary of HEW, about all that can be said with confidence is that we do not know his views on the validity of family maximum regulations within the federal structure.[8] The reason is simple—he has not been asked. Thus, contrary to our admonition given today to the district courts in considering cases in this area, that whenever possible they "should obtain the views of HEW in those cases where it has not set forth its views," *Rosado* v. *Wyman, ante,* at 407, the Government was not invited to file a brief in this case. Perhaps the reason is that this Court is fully versed in the complexities of the Federal AFDC program. I am dubious, however, when

---

[8] In various briefs submitted both to this Court and to other courts in analogous litigation, the Secretary of HEW and the Solicitor General have taken the occasion to label family maximum grant regulations as "arbitrary," oppressive of large families, as resulting in "patently different treatment of individuals," and having received, at least inferentially, the disfavor of Congress. See, *e. g.,* Memorandum for the United States as Amicus Curiae, *Rosado* v. *Wyman, ante,* p. 397; Brief of Robert H. Finch, Secretary of Health, Education, and Welfare as Amicus Curiae, *Lampton* v. *Bonin,* 299 F. Supp. 336, 304 F. Supp. 1384 (D. C. E. D. La. 1969); Brief of Robert H. Finch, *Jefferson* v. *Hackney,* 304 F. Supp. 1332 (D. C. N. D. Tex. 1969). Hence the views of HEW on the precise issue presented in the instant case are, at the very best, ambiguous and quite possibly the opposite of what the Court ascribes to it.

the Court explicitly relies on the failure of the Secretary to disapprove the Maryland welfare scheme. For if anything at all is completely clear in this area of the law it is that the failure of HEW to cut off funds from a state program has no meaning at all. See *Rosado* v. *Wyman, supra,* at 426 (DOUGLAS, J., concurring).

Finally, the Court tells us that Congress has said that the Act permits maximum grant regulations. If it had, this part of the case would be obvious; but, of course, it has not. There is no indication Congress has focused on the family maximum as opposed to individual or other maximums or combinations of such limiting devices.[9] And, to the extent that it could be said to have done so, as my Brother DOUGLAS fully demonstrates, it was in the context of disapproving all maximums and ameliorating the harshness of their effects. See also *Rosado* v. *Wyman, supra,* at 413–414. These slender threads of legislative comment simply cannot be woven into a conclusion of legislative sanction. Cf. *Shapiro* v. *Thompson,* 394 U. S. 618, 638–640 (1969). Further-

---

[9] The maximum may be expressed in terms of a flat dollar amount, as a percentage of the individual's budgetary deficit (*i. e.,* the difference between need and other income), or in both ways. A system of individual maximums may, or may not, be combined with a family maximum, or, alternatively, a family maximum may be imposed in the absence of individual maximums. See generally HEW, State Maximums and Other Methods of Limiting Money Payments to Recipients of the Special Types of Public Assistance, Oct. 1968 (NCSS Report D–3); Sparer, Social Welfare Law Testing, 12 Prac. Law. (No. 4) 13, 21 (1966). In addition, there are differing methods by which family maximums may be related to other resources available to the family. Some States, including Maryland, subtract available resources from the state-calculated need; in other jurisdictions, available resources are subtracted from the family maximum. See, *e. g., Dews* v. *Henry,* 297 F. Supp. 587 (D. C. Ariz. 1969), involving litigation with respect to the Arizona family maximum.

more, it is fundamental that in construing legislation, "we must not be guided by a single sentence or member of a sentence, but [should] look to the provisions of the whole law, and to its object and policy." *Richards* v. *United States,* 369 U. S. 1, 11 (1962). We concluded in *King* v. *Smith, supra,* after an extensive review of the AFDC program, that Congress "intended to provide programs for the economic security and protection of *all* children" and did not intend "arbitrarily to leave one class of destitute children entirely without meaningful protection." 392 U. S., at 330. (Emphasis in original.) That reasoning is likewise applicable to the instant case, in which the maximum grant regulation excludes consideration of the needs of a certain class of dependent children in large families. It is apparent, therefore, that Maryland's maximum grant regulation is not consistent with the Social Security Act, and hence appellees were entitled to the injunction they obtained against its operation.

## II

Having decided that the injunction issued by the District Court was proper as a matter of statutory construction, I would affirm on that ground alone. However, the majority has of necessity passed on the constitutional issues. I believe that in overruling the decision of this and every other district court that has passed on the validity of the maximum grant device,[10] the Court both

---

[10] The lower courts have been unanimous in the view that maximum grant regulations such as Maryland's are invalid. See *Dews* v. *Henry, supra; Westberry* v. *Fisher,* 297 F. Supp. 1109 (D. C. Me. 1969); *Lindsey* v. *Smith,* 303 F. Supp. 1203 (D. C. W. D. Wash. 1969); *Kaiser* v. *Montgomery,* —— F. Supp. —— (D. C. N. D. Cal. 1969). See also *Collins* v. *State Board of Social Welfare,* 248 Iowa 369, 81 N. W. 2d 4 (1957) (family maximum invalid under equal protection clause of state constitution); *Metcalf* v. *Swank,* 293 F. Supp. 268 (D. C. N. D. Ill. 1968) (dictum).

518

reaches the wrong result and lays down an insupportable test for determining whether a State has denied its citizens the equal protection of the laws.

The Maryland AFDC program in its basic structure operates uniformly with regard to all needy children by taking into account the basic subsistence needs of all eligible individuals in the formulation of the standards of need for families of various sizes. However, superimposed upon this uniform system is the maximum grant regulation, the operative effect of which is to create two classes of needy children and two classes of eligible families: those small families and their members who receive payments to cover their subsistence needs and those large families who do not.[11]

This classification process effected by the maximum grant regulation produces a basic denial of equal treatment. Persons who are concededly similarly situated (dependent children and their families), are not afforded equal, or even approximately equal, treatment under the maximum grant regulation. Subsistence benefits are paid with respect to some needy dependent children; nothing is paid with respect to others. Some needy families receive full subsistence assistance as calculated by the State; the assistance paid to other families is grossly below their similarly calculated needs.

---

[11] In theory, no payments are made with respect to needy dependent children in excess of four or five as the case may be. In practice, of course, the excess children share in the benefits that are paid with respect to the other members of the family. The result is that support for the entire family is reduced below minimum subsistence levels. However, for purposes of equal protection analysis, it makes no difference whether the class against which the maximum grant regulation discriminates is defined as eligible dependent children in excess of the fourth or fifth, or, alternatively, as individuals in large families generally, that is, those with more than six members.

Yet, as a general principle, individuals should not be afforded different treatment by the State unless there is a relevant distinction between them, and "a statutory discrimination must be based on differences that are reasonably related to the purposes of the Act in which it is found." *Morey* v. *Doud*, 354 U. S. 457, 465 (1957). See *Gulf, Colorado & Santa Fe R. Co.* v. *Ellis*, 165 U. S. 150, 155 (1897). Consequently, the State may not, in the provision of important services or the distribution of governmental payments, supply benefits to some individuals while denying them to others who are similarly situated. See, *e. g., Griffin* v. *County School Board of Prince Edward County*, 377 U. S. 218 (1964).

In the instant case, the only distinction between those children with respect to whom assistance is granted and those children who are denied such assistance is the size of the family into which the child permits himself to be born. The class of individuals with respect to whom payments are actually made (the first four or five eligible dependent children in a family), is grossly underinclusive in terms of the class that the AFDC program was designed to assist, namely, *all* needy dependent children. Such underinclusiveness manifests "a prima facie violation of the equal protection requirement of reasonable classification," [12] compelling the State to come forward with a persuasive justification for the classification.

The Court never undertakes to inquire for such a justification; rather it avoids the task by focusing upon the abstract dichotomy between two different approaches to equal protection problems that have been utilized by this Court.

Under the so-called "traditional test," a classification is said to be permissible under the Equal Protection Clause unless it is "without any reasonable basis."

---

[12] Tussman & tenBroek, The Equal Protection of the Laws, 37 Calif. L. Rev. 341, 348 (1949).

*Lindsley* v. *Natural Carbonic Gas Co.,* 220 U. S. 61, 78 (1911).[13]   On the other hand, if the classification affects a "fundamental right," then the state interest in perpetuating the classification must be "compelling" in order to be sustained.  See, *e. g., Shapiro* v. *Thompson, supra; Harper* v. *Board of Elections,* 383 U. S. 663 (1966); *McLaughlin* v. *Florida,* 379 U. S. 184 (1964).

This case simply defies easy characterization in terms of one or the other of these "tests."   The cases relied on by the Court, in which a "mere rationality" test was actually used, *e. g., Williamson* v. *Lee Optical Co.,* 348 U. S. 483 (1955), are most accurately described as involving the application of equal protection reasoning to the regulation of business interests.  The extremes to which the Court has gone in dreaming up rational bases for state regulation in that area may in many instances be ascribed to a healthy revulsion from the Court's earlier excesses in using the Constitution to protect interests that have more than enough power to protect themselves in the legislative halls.  This case, involving the literally vital interests of a powerless minority—poor families without breadwinners—is far removed from the area of business regulation, as the Court concedes.  Why then is the standard used in those cases imposed here?  We are told no more than that this case falls in "the area of economics and social welfare," with the implication that from there the answer is obvious.

In my view, equal protection analysis of this case is not appreciably advanced by the *a priori* definition of a "right," fundamental or otherwise.[14]   Rather, con-

---

[13] See generally Developments in the Law—Equal Protection, 82 Harv. L. Rev. 1065, 1076–1087 (1969).

[14] See generally Van Alstyne, The Demise of the Right-Privilege Distinction in Constitutional Law, 81 Harv. L. Rev. 1439 (1968). Appellees do argue that their "fundamental rights" are infringed

centration must be placed upon the character of the classification in question, the relative importance to individuals in the class discriminated against of the governmental benefits that they do not receive, and the asserted state interests in support of the classification. As we said only recently, "In determining whether or not a state law violates the Equal Protection Clause, we must consider the facts and circumstances behind the law, the interests which the State claims to be protecting, and the interests of those who are disadvantaged by the classification." *Kramer* v. *Union School District,* 395 U. S. 621, 626 (1969), quoting *Williams* v. *Rhodes,* 393 U. S. 23, 30 (1968).[15]

---

by the maximum grant regulation. They cite, for example, *Skinner* v. *Oklahoma*, 316 U. S. 535 (1942), for the proposition that the "right of procreation" is fundamental. This statement is no doubt accurate as far as it goes, but the effect of the maximum grant regulation upon the right of procreation is marginal and indirect at best, totally unlike the compulsory sterilization law that was at issue in *Skinner.*

At the same time the Court's insistence that equal protection analysis turns on the basis of a closed category of "fundamental rights" involves a curious value judgment. It is certainly difficult to believe that a person whose very survival is at stake would be comforted by the knowledge that his "fundamental" rights are preserved intact.

On the issue of whether there is a "right" to welfare assistance, see generally Graham, Public Assistance: The Right To Receive; the Obligation To Repay, 43 N. Y. U. L. Rev. 451 (1968); Harvith, Federal Equal Protection and Welfare Assistance, 31 Albany L. Rev. 210 (1967); Note, Welfare Due Process: The Maximum Grant Limitation on the Right To Survive, 3 Ga. L. Rev. 459 (1969). See also Universal Declaration of Human Rights, Art. 25.

[15] This is essentially what this Court has done in applying equal protection concepts in numerous cases, though the various aspects of the approach appear with a greater or lesser degree of clarity in particular cases. See, *e. g., McLaughlin* v. *Florida, supra; Rinaldi* v. *Yeager,* 384 U. S. 305 (1966); *Carrington* v. *Rash,* 380 U. S. 89

It is the individual interests here at stake that, as the Court concedes, most clearly distinguish this case from the "business regulation" equal protection cases. AFDC support to needy dependent children provides the stuff that sustains those children's lives: food, clothing, shelter.[16] And this Court has already recognized several times that when a benefit, even a "gratuitous" benefit, is necessary to sustain life, stricter constitutional standards, both procedural[17] and substantive,[18] are applied to the deprivation of that benefit.

(1965); *Douglas* v. *California*, 372 U. S. 353 (1963); *Skinner* v. *Oklahoma, supra.*

For an application of this approach to several welfare questions, see Comment, Equal Protection as a Measure of Competing Interests in Welfare Litigation, 21 Me. L. Rev. 175 (1969).

[16] See also *Rothstein* v. *Wyman*, 303 F. Supp. 339, 346–347 (D. C. S. D. N. Y. 1969); Harvith, *supra,* n. 14, 31 Albany L. Rev., at 222–226.

[17] See *Sniadach* v. *Family Finance Corp.*, 395 U. S. 337, 340–342 (1969) (relying on devastating impact of wage garnishment to require prior hearing as a matter of due process); *Goldberg* v. *Kelly, ante,* at 264: "Thus the crucial factor in this context— a factor not present in the case of the blacklisted government contractor, the discharged government employee, the taxpayer denied a tax exemption, or virtually anyone else whose governmental entitlements are ended—is that termination of aid pending resolution of a controversy over eligibility may deprive an *eligible* recipient of the very means by which to live while he waits."

[18] Compare *Shapiro* v. *Thompson, supra,* at 627, striking down one-year residency requirement for welfare eligibility as violation of equal protection, and noting that the benefits in question are "the very means to subsist—food, shelter, and other necessities of life," with *Kirk* v. *Board of Regents,* 273 Cal. App. 2d 430, 439–440, 78 Cal. Rptr. 260, 266–267 (1969), appeal dismissed, 396 U. S. 554 (1970), upholding one-year residency requirement for tuition-free graduate education at state university, and distinguishing *Shapiro* on the ground that it "involved the immediate and pressing need for

Nor is the distinction upon which the deprivation is here based—the distinction between large and small families—one that readily commends itself as a basis for determining which children are to have support approximating subsistence and which are not. Indeed, governmental discrimination between children on the basis of a factor over which they have no control—the number of their brothers and sisters—bears some resemblance to the classification between legitimate and illegitimate children which we condemned as a violation of the Equal Protection Clause in *Levy* v. *Louisiana,* 391 U. S. 68 (1968).

The asserted state interests in the maintenance of the maximum grant regulation, on the other hand, are hardly clear. In the early stages of this litigation, the State attempted to rationalize the maximum grant regulation on the theory that it was merely a device to conserve state funds, in the language of the motion to dismiss, "a legitimate way of allocating the State's limited resources available for AFDC assistance." Indeed, the initial opinion of the District Court concluded that the sole reason for the regulation, as revealed by the record, was "to fit the total needs of the State's dependent children, as measured by the State's standards of their subsistence requirements, into an inadequate State appropriation." 297 F. Supp., at 458. The District Court quite properly rejected this asserted justification, for

---

preservation of life and health of persons unable to live without public assistance, and their dependent children."

These cases and those cited in n. 17, *supra,* suggest that whether or not there is a constitutional "right" to subsistence (as to which see n. 14, *supra*), deprivations of benefits necessary for subsistence will receive closer constitutional scrutiny, under both the Due Process and Equal Protection Clauses, than will deprivations of less essential forms of governmental entitlements.

"[t]he saving of welfare costs cannot justify an otherwise invidious classification." *Shapiro* v. *Thompson, supra,* at 633. See *Goldberg* v. *Kelly, ante,* at 266.

In post-trial proceedings in the District Court, and in briefs to this court, the State apparently abandoned reliance on the fiscal justification. In its place, there have now appeared several different rationales for the maximum grant regulation, prominent among them being those relied upon by the majority—the notions that imposition of the maximum serves as an incentive to welfare recipients to find and maintain employment and provides a semblance of equality with persons earning a minimum wage.

With regard to the latter, Maryland has urged that the maximum grant regulation serves to maintain a rough equality between wage earning families and AFDC families, thereby increasing the political support for— or perhaps reducing the opposition to—the AFDC program. It is questionable whether the Court really relies on this ground, especially when in many States the prescribed family maximum bears no such relation to the minimum wage.[19] But the Court does not indicate that a different result might obtain in other cases. Indeed, whether elimination of the maximum would produce welfare incomes out of line with other incomes in Maryland is itself open to question on this record.[20]

---

[19] See HEW Report on Money Payments to Recipients of Special Types of Public Assistance, Oct. 1967, Table 4 (NCSS Report D–4).

[20] The State of Maryland has long spoken with at least two voices on the issue of the maximum grant regulation. The Department of Public Welfare has taken the position, over a number of years, that the regulation should be abolished and has made several proposals to that effect. In so doing, the Department has taken the position that its proposals would not set welfare benefits out of line with household incomes throughout the State. See, *e. g.,* Minutes of State Board of Public Welfare Meeting, September 26, 1958, App. 130–132.

It is true that government in the United States, unlike certain other countries, has not chosen to make public aid available to assist families generally in raising their children. Rather, in this case Maryland, with the encouragement and assistance of the Federal Government, has elected to provide assistance at a subsistence level for those in particular need—the aged, the blind, the infirm, and the unemployed and unemployable, and their children. The only question presented here is whether, having once undertaken such a program, the State may arbitrarily select from among the concededly eligible those to whom it will provide benefits. And it is too late to argue that political expediency will sustain discrimination not otherwise supportable. Cf. *Cooper* v. *Aaron,* 358 U. S. 1 (1958).

Vital to the employment-incentive basis found by the Court to sustain the regulation is, of course, the supposition that an appreciable number of AFDC recipients are in fact employable. For it is perfectly obvious that limitations upon assistance cannot reasonably operate as a work incentive with regard to those who cannot work or who cannot be expected to work. In this connection, Maryland candidly notes that "only a very small percentage of the total universe of welfare recipients are employable." The State, however, urges us to ignore the "total universe" and to concentrate attention instead upon the heads of AFDC families. Yet the very purpose of the AFDC program since its inception has been to provide assistance for dependent *children.* The State's position is thus that the State may deprive certain needy children of assistance to which they would otherwise be entitled in order to provide an arguable work incentive for their parents. But the State may not wield its economic whip in this fashion when the effect is to cause a deprivation to needy dependent children in order to correct an arguable fault of their parents.

Cf. *Levy* v. *Louisiana, supra; King* v. *Smith, supra,* at 334–336 (DOUGLAS, J., concurring); *Doe* v. *Shapiro,* 302 F. Supp. 761 (D. C. Conn. 1969), appeal dismissed, 396 U. S. 488 (1970).

Even if the invitation of the State to focus upon the heads of AFDC families is accepted, the minimum rationality of the maximum grant regulation is hard to discern. The District Court found that of Maryland's more than 32,000 AFDC families, only about 116 could be classified as having employable members, and, of these, the number to which the maximum grant regulation was applicable is not disclosed by the record. The State objects that this figure includes only families in which the father is unemployed and fails to take account of families in which an employable mother is the head of the household. At the same time, however, the State itself has recognized that the vast proportion of these mothers are in fact unemployable because they are mentally or physically incapacitated, because they have no marketable skills, or, most prominently, because the best interests of the children dictate that the mother remain in the home.[21] Thus, it is clear, although the record does not disclose precise figures, that the total number of "employable" mothers is but a fraction of the total number of AFDC mothers. Furthermore, the record is silent as to what proportion of large families subject to the maximum have "employable" mothers. Indeed, one

[21] Indeed, Rule 200, § IX A (2) (b) (5) of the Manual of the Md. Dept. of Social Services prohibits the referral for employment of AFDC mothers who are needed in the home. And the unsuitability of many AFDC mothers has been well chronicled in Md. Dept. of Social Services, Profile of Caseloads, Research Report No. 5, p. 6 (1969). See also Carter, The Employment Potential of AFDC Mothers, 6 Welfare in Review, No. 4, pp. 1, 4 (1968).

must assume that the presence of the mother in the home can be less easily dispensed with in the case of large families, particularly where small children are involved and alternative provisions for their care are accordingly more difficult to arrange. In short, not only has the State failed to establish that there is a substantial or even a significant proportion of AFDC heads of households as to whom the maximum grant regulation arguably serves as a viable and logical work incentive, but it is also indisputable that the regulation at best is drastically *over-inclusive* since it applies with equal vigor to a very substantial number of persons who like appellees are completely disabled from working.

Finally, it should be noted that, to the extent there is a legitimate state interest in encouraging heads of AFDC households to find employment, application of the maximum grant regulation is also grossly *underinclusive* because it singles out and affects only large families. No reason is suggested why this particular group should be carved out for the purpose of having unusually harsh "work incentives" imposed upon them. Not only has the State selected for special treatment a small group from among similarly situated families, but it has done so on a basis—family size—that bears no relation to the evil that the State claims the regulation was designed to correct. There is simply no indication whatever that heads of large families, as opposed to heads of small families, are particularly prone to refuse to seek or to maintain employment.

The State has presented other arguments to support the regulation. However, they are not dealt with specifically by the Court, and the reason is not difficult to discern. The Court has picked the strongest available; the others suffer from similar and greater

defects.[22] Moreover, it is relevant to note that both Congress and the State have adopted other measures that deal specifically with exactly those interests the State contends are advanced by the maximum grant regulation. Thus, for example, employable AFDC recipients are required to seek employment through the congressionally established Work Incentive Program which provides an elaborate system of counseling, training, and incentive payments for heads of AFDC families. See generally 42 U. S. C. §§ 630–644 (1964 ed., Supp. IV).[23] The existence of these alternatives does not, of course, conclusively establish the invalidity of the maximum grant regulation. It is certainly relevant, however, in appraising the overall interest of the State in the maintenance of the regulation.

In the final analysis, Maryland has set up an AFDC program structured to calculate and pay the minimum standard of need to dependent children. Having set up that program, however, the State denies some of those

---

[22] Thus, the State cannot single out a minuscule proportion of the total number of families in the State as in need of birth control incentives. Not only is the classification effected by the regulation totally underinclusive if this is its rationale, but it also arbitrarily punishes children for factors beyond their control, and overinclusively applies to families like appellees' that were already large before it became necessary to seek assistance. For similar reasons, the argument that the regulation serves as a disincentive to desertion does not stand scrutiny.

[23] Likewise, the State, with the encouragement of Congress, see 42 U. S. C. §§ 602 (a)(21), 610 (1964 ed., Supp. IV), has developed extensive statutory provisions to deal specifically with the problem of parental desertion. See generally Md. Ann. Code, Art. 27, §§ 88–96 (1967 Repl. Vol.). And Congress has mandated, with respect to family planning, that the States provide services to AFDC recipients with the objective of "preventing or reducing the incidence of births out of wedlock and otherwise strengthening family life." 42 U. S. C. § 602 (a)(15) (1964 ed., Supp. IV).

needy children the minimum subsistence standard of living, and it does so on the wholly arbitrary basis that they happen to be members of large families. One need not speculate too far on the actual reason for the regulation, for in the early stages of this litigation the State virtually conceded that it set out to limit the total cost of the program along the path of least resistance. Now, however, we are told that other rationales can be manufactured to support the regulation and to sustain it against a fundamental constitutional challenge.

However, these asserted state interests, which are not insignificant in themselves, are advanced either not at all or by complete accident by the maximum grant regulation. Clearly they could be served by measures far less destructive of the individual interests at stake. Moreover, the device assertedly chosen to further them is at one and the same time both grossly underinclusive—because it does not apply at all to a much larger class in an equal position—and grossly overinclusive—because it applies so strongly against a substantial class as to which it can rationally serve no end. Were this a case of pure business regulation, these defects would place it beyond what has heretofore seemed a borderline case, see, e. g., *Railway Express Agency* v. *New York,* 336 U. S. 106 (1949), and I do not believe that the regulation can be sustained even under the Court's "reasonableness" test.

In any event, it cannot suffice merely to invoke the spectre of the past and to recite from *Lindsley* v. *Natural Carbonic Gas Co.* and *Williamson* v. *Lee Optical Co.* to decide the case. Appellees are not a gas company or an optical dispenser; they are needy dependent children and families who are discriminated against by the State. The basis of that discrimination—the classification of individuals into large and small families—is too

arbitrary and too unconnected to the asserted rationale, the impact on those discriminated against—the denial of even a subsistence existence—too great, and the supposed interests served too contrived and attenuated to meet the requirements of the Constitution. In my view Maryland's maximum grant regulation is invalid under the Equal Protection Clause of the Fourteenth Amendment.

I would affirm the judgment of the District Court.