Robert SLAVIN, a mentally disabled person, by his natural father, Arthur Slavin, Plaintiff,

v.

SECRETARY OF the DEPARTMENT OF HEALTH, EDUCATION AND WELFARE of the United States of America and Commissioner of the State of New York Department of Social Services, Defendants.

No. 78 Civ. 1799(GLG).

United States District Court, S. D. New York.

March 17, 1980.

Murray B. Schneps, New York City, for plaintiff.

William M. Tendy, U. S. Atty., New York City, by Michael H. Dolinger, Asst. U. S. Atty., New York City, for defendant, HEW.

Robert Abrams, Atty. Gen., New York City, for defendant, The Commissioner, by Marion R. Buchbinder, Asst. Atty. Gen., New York City.

## OPINION

GOETTEL, District Judge:

In this case, the plaintiff seeks review of the determination of the Secretary of Health, Education, and Welfare ("Secretary") regarding the plaintiff's eligibility for federal Supplemental Security Income ("SSI"), his eligibility for optional state supplemental payments, and the level of those payments. The plaintiff and both of the defendants, the Secretary and the Commissioner of the State of New York Department of Social Services ("State Commissioner"), have moved for summary judgment.

The plaintiff, Robert Slavin, is a mentally handicapped adult who functions at a profoundly retarded level as a result of childhood schizophrenia with autism. His parents live in Westchester County, New York. Robert lived with his parents until at age eighteen or nineteen his parents took him to the American Institute for Mental Studies in Vineland, New Jersey ("Vineland"). Robert spends most of his time at Vineland, where he lives in a cottage with about twenty other handicapped individuals and receives supervision and some therapy. At least once every two months, Robert returns to his parents' home for visits of varying length; he has his own room in his parents' home, where he keeps a large part of his clothing and personal possessions. Although Robert—now twenty-nine years old—has lived at Vineland for more than ten years and receives care there with which his parents are satisfied, his parents assert that they never intended Vineland to be Robert's permanent home.

To help cover the cost of Robert's attendance at Vineland, which is $8100 per year, Arthur Slavin applied for SSI benefits on behalf of his son. An administrative law judge ("ALJ") in the Social Security Administration decided on September 23, 1977: that Robert was entitled to SSI benefits; that the basic SSI benefit payment was to be reduced to take account of the payments Arthur Slavin made to Vineland for his son's care; and that Robert, as a resident of New Jersey, was entitled to optional supplemental payments from New Jersey but not from New York.[1] The decision of the ALJ was affirmed by the Appeals Council in the Social Security Administration on February 23, 1978, and thus became the final decision of the Secretary. In seeking review of that decision, the plaintiff contends that the federal portion of his payment should not be reduced on account of his father's payments to Vineland, that he is a resident of New York, and that he is entitled to New York

---

1. An earlier decision by another ALJ, on April 8, 1976, had reached essentially the same conclusions. Since the issue of whether Robert was a resident of New York or New Jersey had not been fully explored in the earlier hearing, however, a new hearing was granted.

optional supplemental payments at a level set for "congregate care."[2]

### The Federal Payment

The federal SSI program was instituted to aid needy aged, blind, and disabled persons. *See* 42 U.S.C. §§ 1381, 1381a (1976). For individuals who meet the eligibility requirements—being aged, blind, or disabled, and having income and resources under statutorily defined amounts—uniform federal payment levels are set. *See id.* § 1382(b). The federal payments are reduced by the amount of any income received by an eligible individual. *Id.* Income may be "earned" or "unearned"; unearned income includes payments for "support and maintenance furnished in cash or kind." *Id.* § 1382a(a)(2)(A). Support and maintenance received in kind, however, are presumed to have a value of one-third of the federal payment level. *Id.*; 20 C.F.R. § 416.1125(b) (1979). Payments by a third party for support and maintenance of an eligible individual in a nonmedical institution, either proprietary or private nonprofit, are treated as in-kind support and thus are also presumed to have a value of one-third of the standard payment level. 20 C.F.R. § 416.1125(h). Thus, in such situations, the federal payment is reduced by one-third of the standard payment rather than by the full value of the support received. Third-party payments for medical services furnished to a beneficiary are excluded from the definition of "income"; thus, no reduction in the federal standard payment is made for such sums. *Id.* § 416.1109(a).[3]

The decision of the Secretary concluded that Arthur Slavin's payments to Vineland for his son's care did not fall within the medical exclusion of 20 C.F.R. § 416.1109(a), since the care Robert Slavin receives there is custodial, not medical. Thus, the one-third reduction in Robert's federal SSI payment was found to be proper. The plaintiff argues that those payments do fall within the exclusion and that, therefore, no reduction in the standard federal payment should be made.

The Secretary's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). There is substantial evidence in the record that the care Robert receives at Vineland is custodial. The Vineland personnel who supervise and care for Robert are not medically trained. Only approximately $200 of the $8100 annual cost of his care at Vineland is for medicines—mostly tranquilizers to sedate Robert when he is unmanageable. Under the present state of medical knowledge, there is apparently no hope that Robert can be cured of his disability.[4] The therapy he receives consists of simple activities designed merely to keep him from vegetating rather than to train him or diminish his disability.

■ According to the regulations, the relevant consideration is whether the care received is medical,[5] not, as the plaintiff argues, whether the condition from which the recipient suffers is medical in origin. Thus, if the Secretary's characterization of the care received is accepted, the Secretary's conclusion that Arthur Slavin's payments to Vineland do not fall within the exclusion must also be accepted. The Secretary's interpretation of the exclusion is also supported by a federal district court decision construing that provision. *See Lapin v. Mathews*, 422 F.Supp. 1089 (D.D.C. 1976). Furthermore, the Secretary's interpretation appears to be in accord with congressional intent. The SSI program was enacted as Title XVI of the Social Security Act, *see* 42 U.S.C. §§ 1381 *et seq.*, to provide

---

**2.** For a discussion of New York's supplemental payments levels, *see* text accompanying notes 8–9 *infra*.

**3.** The regulation provides:

The term "income" does not include the value of any third-party payment for medical care or medical services furnished to a beneficiary. This exclusion from income also applies to

room and board furnished during medical confinement and paid for by such third party.

**4.** If advances in medical knowledge should make medical treatment appropriate in the future, of course, this statement and the conclusions based on it would need to be changed.

**5.** *See* note 3 *supra*.

for the basic needs—food, clothing, and shelter—of those eligible. Medical care for those eligible is provided by the Medicaid program under Title XIX. *See* 42 U.S.C. §§ 1396 *et seq.* The two programs have different purposes and criteria and are administered separately. The reduction in SSI payments by the amount of the beneficiary's other income, including support and maintenance furnished by others either in cash or in kind, is meant to avoid having the government pay for basic needs already being met. The regulations, in allowing payments from other sources for medical care to be disregarded for purposes of computing the need for SSI payments, accord with the statutory scheme of separate programs to meet the need for food, clothing, and shelter and to meet the need for medical care.

The plaintiff argues that, even if the Secretary's decision is correct in its conclusion that Arthur Slavin's payments are not within the exclusion from unearned income, to distinguish between individuals receiving medical care and those receiving custodial care violates the guarantee of equal protection embodied in the Due Process Clause of the Fifth Amendment. The test for invidious discrimination in violation of equal protection normally used for social welfare legislation is the "rational basis" test. *Termini v. Califano*, 611 F.2d 367, 369–70 (2d Cir. 1979) (citing, *inter alia, Califano v. Aznavorian*, 439 U.S. 170, 174–75, 99 S.Ct. 471, 473–474, 58 L.Ed.2d 435 (1978); *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970)). The plaintiff does not suggest that a more rigorous standard of review should be applied in this case.

■ As is suggested above, the regulation in question is not without a rational basis. Since the purpose of the SSI program is to provide for basic needs, it is rational to reduce the payments to the extent that those needs are being met through payments from other sources. Medical care is usually temporary care administered for the purpose of curing a specific illness or condition. Although it may incidentally provide for some basic needs as well, that is not its main purpose. Furthermore, a patient receiving medical care normally retains a residence to which to return after the conclusion of the medical treatment and therefore continues to need SSI payments. Thus, it is rational to exclude payments for medical care from the computation of unearned income, which operates to reduce SSI payments.

■ The fact that a particular distinction may work a hardship on a particular individual does not mean that the distinction violates equal protection. The Supreme Court has observed: "Social welfare legislation, by its very nature, involves drawing lines among categories of people, lines that necessarily are sometimes arbitrary. This Court has consistently upheld the constitutionality of such classifications in federal welfare legislation where a rational basis existed for Congress' choice." *Califano v. Aznavorian*, 439 U.S. 170, 174, 99 S.Ct. 471, 474, 58 L.Ed.2d 435 (1978). "If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.'" *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970) (quoting *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911)).

### The State Payment

Federal SSI payments are uniform throughout the United States. Some states make additional payments to needy persons, however, and, under 42 U.S.C. § 1382e, may enter into agreements with the Secretary providing for federal administration of those payments. Both New York and New Jersey provide such optional supplemental payments and have entered into such agreements with the Secretary.

The decision of the Secretary in this case held that Robert Slavin was entitled to receive optional state supplemental payments from New Jersey but not from New York, since he was a resident of New Jer-

sey, not New York.[6] The plaintiff argues that he is a resident of New York and is entitled to receive New York payments, which are comparatively generous. *See* notes 8–10 *infra* and accompanying text and note 11 *infra*.

██ The New York statute providing for "additional state payments for aged, blind and disabled persons," N.Y.Soc.Serv.Law §§ 207–212 (McKinney 1976 & Supp.1979), defines eligibility in terms of residence. To be eligible, an individual must be "a resident of the state," *id.* § 209(1)(a)(iv), and must continue "to reside in the state." *Id.* § 209(1)(c). The term "residence" has a variable meaning. It is often distinguished from "domicile"; usually "residence" is the term used to denote something more temporary than "domicile," and it depends more on actual presence in a certain place and less on intent than does "domicile." 17 N.Y.Jur. *Domicil and Residence* § 2 (1961 & Supp.1979). The New York courts, however, in cases involving entitlement to social welfare benefits, have chosen to equate "domicile" and "residence" and have focused on a potential beneficiary's intent. *See Seitelman v. Lavine*, 36 N.Y.2d 165, 325 N.E.2d 523, 366 N.Y.S.2d 101 (1975); *Corr v. Westchester County Department of Social Services*, 33 N.Y.2d 111, 305 N.E.2d 483, 350 N.Y.S.2d 401 (1973); *Ruiz v. Lavine*, 49 A.D.2d 1, 370 N.Y.S.2d 710 (4th Dep't 1975). The court in *Ruiz* stated flatly that, "for purposes of the Social Services Law," residence "must be determined by reference to the same criteria as are used to determine domicile" and that "an individual's intention is the most important factor in deter-

mining his domicile." 49 A.D.2d at 4, 370 N.Y.S.2d at 714. In *Seitelman*, a case with facts quite similar to those in the instant case, the New York Court of Appeals held that a mentally retarded adult did not lose his New York State residency by attending Vineland in New Jersey.[7] Since the plaintiff asserts that he remains a New York resident and since, as a mentally handicapped person, he is probably incapable of forming the requisite intent to change his domicile, he should be considered a New York resident for the purpose of establishing eligibility for New York's additional state payments.

Deciding that the plaintiff is entitled to claim New York residence does not end the inquiry concerning his eligibility for New York's additional state payments. There remains the question of the level of payments to which the plaintiff, as a resident of New York, is entitled—a question the ALJ did not address, since he decided that the plaintiff was not a resident of New York.

New York's statute provides for five categories, with different payment levels, based on the beneficiary's living arrangements: "living alone," "living with others," "receiving family care," "receiving residential care," and "receiving care in a residential facility for the mentally retarded."[8] N.Y.Soc.Serv.Law § 209(2). Within some of these categories are subcategories based on the county where the beneficiary receives the care.[9] *Id.* The last three categories, often described as "congregate care," clearly contemplate that the care will be received in New York. For the "family care"

**6.** Since this is a conclusion of law, not a finding of fact, the Secretary's decision is not entitled to the presumption of validity under the substantial evidence rule. *Sokoloff v. Richardson*, 383 F.Supp. 234, 236 (E.D.N.Y.1973).

**7.** The ALJ dismissed the *Seitelman* case as "of no real value to claimant in the instant case," on the ground that the statute then in effect, N.Y.Soc.Serv.Law § 303, which provided for New York approval of out-of-state institutions, had since been repealed. The *Seitelman* court's decision on the question of residence, however, is distinct from its decision on whether Vineland was a residential facility "ap-

proved" by New York State. The court's holding on residence was unaffected by the repeal in 1974 of N.Y.Soc.Serv.Law § 303 and remains the law of New York.

**8.** The statute also provides different payment levels for individuals and couples within each category. N.Y.Soc.Serv.Law § 209(2) (McKinney 1976 & Supp.1979).

**9.** The reason for establishing geographical subcategories was apparently to take account of differences in actual costs in homes and institutions in different parts of the state.

and "residential facility" categories, there are two payment levels, one for care received in New York City and one for care received in counties outside New York City. *Id.* For all three congregate care categories, the care must be provided in homes or groups residences that are approved, supervised, or licensed by the New York Department of Mental Hygiene "in accordance with applicable provisions of law." *Id.* § 209(3). The statutory scheme appears to establish *no level of payment for institutional care outside New York State.*

Logically, it could be argued that, if the plaintiff is claiming benefits as a New York resident, the appropriate payment level is "living with others," since that describes his living arrangement when he is in New York State at his parents' home. New York's additional state payment for that level is $218.74 per month. N.Y.Soc.Serv.Law § 209(2)(b) (McKinney Supp.1979). New York State, however, has apparently authorized the "living alone" rate, which is now $271.41, *id.* § 209(2)(a), for New York residents institutionalized outside the state. New York may also have authorized, in a few instances, one of the congregate care levels of payment for New York residents institutionalized outside the state.

The plaintiff argues that he is entitled to a congregate care level of payment, specifically that for care in a residential facility for the mentally retarded,[10] as if the facility he attends were located in Westchester County, New York, for which the rate is now $669.46. *Id.* § 209(2)(e). The State Commissioner asserts that if Robert Slavin is entitled to any New York State payments, it is only at one of the noninstitutional levels.

The purpose of the New York statute is to meet the "income needs" of the SSI recipients and "to maintain assistance for such persons at a level consistent with their needs." N.Y.Soc.Serv.Law § 207 (McKinney 1976). It is undisputed that Robert Slavin needs institutionalized care and that the care he is receiving costs $8100 annually. Neither of the noninstitutionalized levels of payment (which New York State apparently would be willing to make to the plaintiff) is consistent with his needs.[11] On the contrary, the congregate care level for care in a residential facility for the mentally retarded seems to be the only payment level consistent with the plaintiff's needs.

New York State may have valid reasons for a policy of reserving the highest levels of payments—the institutional rates—for use within the state, so as to encourage its residents to use in-state institutions rather than out-of-state institutions. Such a policy, however, presumes the existence of appropriate in-state institutions. Without adequate institutions, even a strong justification for such a policy, which the defendants have yet to offer, would be unpersuasive.

The plaintiff maintains that there are no facilities in New York State adequate to his needs. Defendant State Commissioner asserts that there are such facilities. The ALJ made no finding on the issue. If there were, in fact, no appropriate facilities in New York for the plaintiff, it would be unfair to penalize the plaintiff for seeking appropriate care outside the state. Reducing his additional state payment from the congregate care level he would be entitled to receive if he were attending a New York institution to one of the much lower noninstitutional rates would also violate the statute's purpose of providing aid consistent with the recipient's needs.

Defendant State Commissioner argues that he has neither the power nor the resources to authorize congregate care level payments to New York residents in out-of-state institutions. That argument is weakened by the evidence that New York has

---

10. Although the plaintiff did not specify in his moving papers which payment level he believed he was entitled to, in oral argument he claimed eligibility for the highest level of congregate care payments.

11. It should be noted, however, that New York's "living alone" rate is higher than New Jersey's "living alone" rate of $231 per month and that New Jersey grants payments to its own residents attending Vineland at the "living alone" rate.

approved out-of-state institutions, including Vineland, both for other purposes and for the purposes involved in the instant case under the predecessor statute. Furthermore, as noted above, under the current statute, New York has apparently approved additional state payments, at both the "living alone" rate and the congregate care rates, to New York residents attending out-of-state institutions.

Even if making an exception to the normal statutory framework in Robert Slavin's case would entail some administrative burden on the state,[12] that burden is outweighed by the hardship the plaintiff would suffer if he were to receive only a noninstitutional level of payment despite his need for institutionalized care and despite the lack of appropriate facilities for him in New York State. The Court finds the imposition of such a burden on the plaintiff incompatible with the purposes of the New York statute and declines to interpret the statute to require that burden.

■ This Court is empowered to "order additional evidence to be taken before the Secretary," "at any time, on good cause shown." 42 U.S.C. § 405(g).[13] Where, as here, relying on an incorrect conclusion of law, the Secretary omitted to make factual findings on matters that are essential to a determination of the plaintiff's benefits, remand for taking additional evidence and making additional findings is particularly appropriate. *See, e. g., Talifero v. Califano,* 426 F.Supp. 1380, 1387–90 (W.D.Mo.1977); *Selig v. Richardson,* 379 F.Supp. 594, 602–03 (E.D.N.Y.1974). Accordingly, the case is remanded to the Secretary to take additional evidence and to determine which of New York's additional state payment levels is the proper one for the plaintiff. The Secre-

tary is directed to take evidence on whether New York State has facilities appropriate to the plaintiff's needs and to make a finding on that issue. If the Secretary finds that New York State has no such facilities, then the Secretary should determine which of New York's additional state payment levels is appropriate to the plaintiff's needs as the recipient of institutionalized care costing $8100 annually.[14] If the Secretary finds that New York State does have facilities appropriate to the plaintiff's needs and that removal of the plaintiff from Vineland to New York would not entail undue hardship, the Secretary should take whatever additional evidence is necessary to determine the proper level of additional state payments for the plaintiff and make a finding on that issue.

### Conclusion

The findings of the Secretary regarding the one-third reduction in the plaintiff's federal SSI payments, to take account of the plaintiff's "unearned income," are affirmed. With regard to the optional state supplement, the Secretary's legal conclusion that the plaintiff is not a New York resident for the purpose of receiving additional state payments is reversed. The case is remanded to the Secretary for a determination of the level of additional state payments to which the plaintiff is entitled.

SO ORDERED.

---

12. There is no burden on defendant Secretary, who apparently makes optional state supplemental payments at whatever levels New York State authorizes, for which payments the Secretary is reimbursed.

13. Section 405 is the general procedural section for Federal Old-Age, Survivors, and Disability Insurance Benefits, and subsection 405(g) contains the provisions for judicial review of the Secretary's decisions. The SSI statute provides that review of final determinations of the

Secretary regarding SSI benefits is the same as that provided in subsection 405(g). 42 U.S.C. § 1383(c)(3).

14. In addition, the Court does not preclude a finding by the Secretary that, despite the existence of appropriate facilities in New York, Vineland is so far superior to those facilities as to make removal of the plaintiff from Vineland an undue hardship.