Madeline **ROSENBERG, by her natural mother, Margaret ROSENBERG; Bess Levine, by her natural mother, Janet Levine, individually and on behalf of all those similarly situated, Plaintiffs,**

v.

**Margaret M. HECKLER, Secretary of the Department of Health and Human Services, and the Commissioner of the New York State Department of Social Services, Defendants.**

No. 79 Civ. 4953 (GLG).

United States District Court, S.D. New York.

Oct. 1, 1985.

---

Murray B. Schneps, New York City, for plaintiffs Rosenberg and Levine.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City (David R. Lewis, Asst. U.S. Atty., Annette H. Blum, Regional Atty., Region II, Joseph V. Willey, Asst. Regional Atty., Dept. of Health and Human Services, New York City, of counsel), for Margaret M. Heckler.

Robert Abrams, Atty. Gen. of the State of N.Y., New York City (Stanley A. Camhi, Marion R. Buchbinder, Asst. Attys. Gen., New York City, of counsel), for State defendants.

## OPINION

GOETTEL, District Judge.

On September 9, 1980, this Court remanded these matters to the Secretary of

Health, Education, and Welfare ("Secretary") for administrative action in accordance with the Court's March 8, 1980 order in *Slavin v. Secretary,* 486 F.Supp. 204 (S.D.N.Y.1980). Currently before the Court is the plaintiffs' motion for an order rejecting in part and affirming in part the Secretary's decision and supplemental decision regarding each claimant's eligibility for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–1383c (1982), and entitlement to New York State supplementary payments, under the New York State Social Services Law, N.Y.Soc.Serv.Law §§ 207–12 (McKinney 1976 & Supp.1984). For the following reasons, the plaintiffs' motion is denied.

### I. Background

Plaintiff Madeline Rosenberg, a forty-two year old resident of Queens County, suffers from profound mental retardation and seizures. Ms. Rosenberg has an I.Q. of approximately twenty and a mental age of two to two and a half years. She is able to undress herself but needs assistance in dressing herself. She also needs assistance in cutting her food and in taking care of her personal hygiene. Ms. Rosenberg is subject to both petite mal and grand mal seizures. Ms. Rosenberg's doctors have recommended that she not take extended rides in vehicles because they believe that the trips might be a factor causing her seizures. Members of a consultant team from the New York State Office of Mental Retardation and Developmental Disabilities ("the New York team") who examined Ms. Rosenberg in August 1980, reported that she could walk slowly without assistance. They also found that while Ms. Rosenberg needed verbal prompting to climb stairs, she demonstrated the skill and potential to be independent.

In 1974, Ms. Rosenberg began receiving SSI and New York State supplementary payments. Federal SSI payments are uniform throughout the United States. Some states make additional payments to needy persons, and pursuant to 42 U.S.C. § 1382c, may enter into agreements with the Secretary of the Department of Health and Human Services ("the Secretary") to provide for federal administration of those payments. New York provides such optional supplementary payments and has entered into an agreement with the Secretary to administer those payments. The New York statute providing such payments to "aged, blind and disabled persons," N.Y. Soc.Serv.Law §§ 207–12 (McKinney 1976 & Supp.1980), defines eligibility in terms of residence. To be eligible, an individual must be "a resident. of the state," *id.* § 209(1)(a)(iv), and must continue "to reside in the state." *Id.* § 209(1)(c).

From sometime in 1965 until August 1975, Ms. Rosenberg attended and resided at the Fairview School in New York State. When Fairview announced its plans to close, Ms. Rosenberg transferred to the Vineland Training School of the American Institute for Mental Studies at Vineland, New Jersey ("Vineland"). Consequently, in August 1976, the Social Security Administration notified Ms. Rosenberg that her New York State supplementary payments were being terminated because her attendance at a school in New Jersey made her a New Jersey resident. Therefore, she was not entitled to New York's supplementary benefits. The plaintiff requested and received a hearing before an Administrative Law Judge ("ALJ") in the Social Security Administration to determine the legality of her termination. The ALJ denied her claims. Her appeal of that decision was unsuccessful.

Like Madeline Rosenberg, plaintiff Bess Levine is a disabled adult who has been denied the New York supplementary payment because she attends a facility outside New York State. Ms. Levine, a thirty-seven year old resident of Kings County, New York, suffers from a rare disease known as familial dysautonomia. Manifestations of her disease include defective lacrimation, insensitivity to pain, vomiting, respiratory infection, and most significantly, dysautonomic episodes or "seizures" in which she becomes violent and abusive. There is conflicting evidence regarding the frequency

of Ms. Levine's seizures. Her brother testified that she experiences seizures three to six times a year. Similarly, doctors from the New York team who examined Ms. Levine in August 1980, reported an average frequency of four seizures per year. However, the physical therapist who was part of the New York team and who also examined Ms. Levine's medical history reported that Ms. Levine had experienced only seven episodes from February 1969 until August 1980, with just two occurring since January 1971.

Ms. Levine is mildly retarded. Her language and mathematical skills range from the fourth to the sixth grade levels. She has, however, earned a general diploma issued by the New York State Department of Education.

Ms. Levine also has severe kyphoscoliosis, curvature of the spine. Despite this handicap, the physical therapist who was part of the New York team noted that Ms. Levine's gait pattern is functional. She further reported that Ms. Levine would be able to function motorically in the community even though her motor functioning exhibited deviations from the norm. In fact, Ms. Levine told members of the New York team that she travels alone by taxi to a local shopping center and shops independently. Ms. Levine is also independent in bathing, dressing, eating, grooming, and toiletting skills.

Since 1968, when her family became unable to cope with the frequency and severity of her dysautonomic episodes, Ms. Levine has attended the Elwyn Institute ("Elwyn") at Elwyn, Pennsylvania. She was placed in Elwyn on the recommendation of the New York State Department of Education. The state provided partial funding through the school year in which she turned twenty-one. In 1974, the Social Security Administration granted her application for SSI but rejected her application for New York State Supplementary payments. Pursuant to a written demand by Ms. Levine, an ALJ held a hearing in February 1977 to consider her application. The ALJ declared her eligible to receive the New York State supplement despite her attendance at a facility outside of New York State. In April 1978, the appeals council reversed the ALJ's decision. Ms. Levine was found ineligible for New York State supplementary payments on the basis of her residence at an institution outside of New York.

In September 1979, Ms. Levine and Ms. Rosenberg filed a class action complaint seeking relief on behalf of themselves and all other mentally disabled New York State residents who had been denied either SSI or New York State supplementary payments or both because of their attendance at residential facilities for the mentally disabled located outside of New York State. No motion for class certification was ever filed. On their own behalf, Ms. Rosenberg and Ms. Levine sought review of the appeals council decisions denying their claims for New York State supplementary payments.

In September 1980, this court issued an order remanding the plaintiffs' claims to the ALJ for a decision consistent with this Court's decision in *Slavin v. Secretary of Health, Education, and Welfare,* 486 F.Supp. 204 (S.D.N.Y.1980). *Slavin* held that a mentally retarded adult does not lose her New York State residence, and consequent eligibility for social welfare benefits, merely by attending an out-of-state residential facility. *Id.* at 208. *Slavin* proceeded to discuss in further detail eligibility for supplementary payments under the Social Services law. That law provides for five categories of supplementary benefits to mentally and physically disabled persons, with different payment levels based on a beneficiary's living arrangements. One such level, known as Congregate Care Level III ("Level III"), provides payments to those "receiving care in a residential facility for the mentally retarded." N.Y. Soc.Serv.Law 209(2) (McKinney 1976). *Slavin* held that an individual could attend an appropriate facility outside New York State and remain eligible for this congregate care level of payment so long as New York did not have an appropriate facility

available to her. Moreover, even if New York had an appropriate facility available to a New York resident attending an out-of-state institution, if transfer to the New York facility would create an undue hardship for the claimant, she would be entitled to supplementation at a congregate care level. *Id.* at 210. However, an individual in an out-of-state facility who did not meet these criteria would be eligible only for the lower, "living alone" rate of payment.

The ALJ held a *de novo* hearing for each plaintiff. His findings with respect to plaintiff Rosenberg were equivocal, but he found Ms. Levine eligible for Congregate Care Level III payments beginning January 1974.

In reviewing the ALJ's decision, the appeals council found that both Ms. Rosenberg and Ms. Levine had been New York state residents at all pertinent times. They found that from September 1975 to November 1975, New York state had no institutions or facilities appropriate for and available to Ms. Rosenberg, but that since December 1975, New York had appropriate available facilities. However, because removal of Ms. Rosenberg from Vineland to an appropriate available New York facility during the period from December 1975 through November 1980, would have constituted undue hardship, she was eligible for Level III state supplementatary payments for that period. Beginning in December 1980, Ms. Rosenberg was found eligible only for the lower, "living alone" rate, so long as she remained in a non-superior institution outside New York state, because transfer to an appropriate available New York facility would no longer have constituted undue hardship.

With respect to Ms. Levine, the appeals council found that from January 1974 through June 1981, New York state had no appropriate available institutions or facilities, and that since July 1981, New York state has had appropriate available institutions to which transfer would not constitute undue hardship. Thus, until June 30, 1981, Ms. Levine was entitled to Level III state supplementary payments. There-

after, she was eligible for state supplementary payments at the "living alone" rate, so long as she remained in an out-of-state institution that was not superior to an appropriate available New York facility.

Both plaintiffs now move for an order rejecting in part and affirming in part the appeals council's determinations. Ms. Rosenberg does not challenge the determination in her favor for the period through November 30, 1980. She contests the findings that appropriate facilities within New York state were available to her beginning December 1, 1975, and that her removal from Vineland after November 30, 1980, would not have constituted an undue hardship. She further contends that the appeals council's conclusion that, commencing December 1, 1980, appropriate available facilities existed in New York state wholly disregards the import of the testimony at the hearing. Ms. Levine argues that the testimony before the ALJ failed to establish the existence of any appropriate available facility in New York after July 1, 1981.

## II. Discussion

The only issue for review is whether the Secretary's post-hearing determinations are supported by substantial evidence. The Second Circuit recently defined "substantial evidence" as " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' It is 'more than a mere scintilla'.... [E]ven if [a] court could draw different conclusions from those drawn by the agency, that would not prevent the agency's decision from being supported by substantial evidence." *Local One, Amalgamated Lithographers of America v. NLRB,* 729 F.2d 172, 175–76 (1984) (citations omitted).

### A. Madeline Rosenberg

#### 1. Appropriate Available Facilities

Neither side contests the appeals council's finding that until November 30, 1980, transfer of Ms. Rosenberg to an appropriate available facility would have constitut-

ed undue hardship. Thus, we need only examine the availability of appropriate facilities for Ms. Rosenberg as of December 1980.

■ Ms. Rosenberg contends that the testimony of her mother, Mrs. Margaret Rosenberg, describing continuous, persistent efforts since 1975 to locate a suitable New York facility, conclusively establishes that since 1975 no appropriate facility was available in New York. Mrs. Rosenberg testified that although she communicated with facilities located in New York, voluntary agencies providing residential services to the mentally retarded, professionals in the field of mental retardation, and the New York City Regional Office of the Office of Mental Retardation and Developmental Disabilities, she was unable to locate an appropriate available facility. Plaintiff Rosenberg contends that the testimony of the state's six witnesses at her hearing and that of the three witnesses at the *Slavin* hearing[1] fails to ·counter her mother's testimony. She asserts that the testimony of these witnesses was "initial and tentative at best, did not establish either availability or appropriateness, [was] not based upon sufficient data to draw any proper conclusion and did not even include all of the 'data' available at that time." Declaration of Murray B. Schnepps, Esq. at 7. She further contends that the priorities accorded to both "Willowbrook class members"—individuals whom a 1975 federal court order obligated New York state to place into residential facilities—and to mentally retarded New York residents not receiving any community residential services, made her placement extremely unlikely.

We find these contentions unpersuasive. The evidence substantially supports the conclusion that, as of December 1, 1980, facilities appropriate to plaintiff Rosenberg's needs were available in New York

state. On February 13, 1981, an Assistant Attorney General of the State of New York wrote to Ms. Rosenberg's counsel describing specific appropriate residential and day programs for Ms. Rosenberg including the Bernard Fineson Developmental Center ("Fineson") in Corona, Queens. Fineson has been accepting clients on Ms. Rosenberg's functioning level since 1978. The building has elevators, eliminating problems associated with Ms. Rosenberg's difficulty in climbing stairs. There is a day program in the building. The availability of this program eliminates the risk that Ms. Rosenberg will experience seizures induced by vehicular travel to a day program. Booth Memorial Hospital or Flushing General Hospital would provide back-up medical services if necessary. Judith DeIasi, who as Director of Community Placement Services for the Office of Mental Retardation and Developmental Disabilities is responsible for placing community clients and Willowbrook class members, testified that Fineson has had on-going vacancies since at least 1978. Thus, the Assistant Attorney General's description and the testimony at the hearing provided a substantial basis for the appeals council's conclusion that Fineson was an appropriate available facility as of December 1, 1980.[2]

We believe that the priority accorded the placement of Willowbrook class members was no longer a factor preventing the availability of an appropriate facility as of the March 1980 *Slavin* order. That court order warned the state that its policy of denying Level III funding to mentally retarded residents institutionalized out of state was in jeopardy. Consequently, after *Slavin*, placement for individuals such as Ms. Levine in an appropriate New York facility was in New York's best interest despite any other existing class priorities.

---

1. That testimony was made part of the hearing record herein.

2. Although state witnesses admitted that they would need additional information to ensure that a specific placement was available or appropriate, their opinions are not properly characterized as "inital and tentative at best." *See*

Declaration of Murray B. Schnepps, Esq. at 7. We can never be sure that placement is appropriate until that placement actually occurs. Therefore, we must rely upon these expert opinions to evaluate the appropriateness and availability of a specific placement.

### 2. Undue Hardship

■ The appeals council found that although Vineland had an international reputation for the care of the mentally retarded for many decades and was on the New York State Department of Education's approved list of schools for the handicapped, it was not actually superior to the appropriate available New York facilities since August 1975. The evidence at the hearing supported that finding. Nonetheless, the appeals council—applying an extremely generous interpretation of the term "undue hardship"—concluded that until November 1980, undue hardship existed because Ms. Rosenberg's mother reasonably believed, based on Vineland's long-established international reputation, that Vineland was a superior facility. As of November 1980, however, when New York state notified the parents and guardians of New York state students at Vineland that Vineland's accreditation was removed effective January 1981, she had reason to believe that Vineland was no longer superior. Even if, as Ms. Rosenberg claims, Vineland's disaccreditation related only to school-aged children, the disaccreditation put Ms. Rosenberg's mother on notice that the overall quality of Vineland was no longer superior to appropriate available New York State institutions. Regardless of the test applied by the appeals council, there is no doubt that substantial evidence supported the conclusion that Ms. Rosenberg's removal from Vineland after November 30, 1980 would not have constituted an undue hardship.

### B. Bess Levine

### 1. Appropriate Available Facilities

■ Substantial evidence also supports the appeals council's conclusion that since July 1, 1981, facilities appropriate for and available to Bess Levine existed in New York. In February 1981, the state notified Ms. Levine's counsel that she had been recommended for placement at a newly opened facility for retarded adult women located in Brooklyn and operated by Bais Ezra, a voluntary agency. This institution was to be staffed by several trained specialists and run by a live-in couple. Maimonides Hospital would provide backup medical services. While at this facility, Ms. Levine would attend a day program in Brooklyn or Manhattan. In June 1981, after Ms. Levine's guardians failed to follow up on this recommendation, the state notified her brother and her attorney that she had been accepted for immediate interim placement at the "Housing for the Disabled" in the Bronx with the intention of transfer to the "Carmel" residence in Brooklyn scheduled to open in December 1981. However, counsel for Ms. Levine refused permission for Builders for Family and Youth ("BFY") (the operator of the "Carmel" residence) staff to examine Ms. Levine in order to make a final determination about her placement at the Carmel residence. Her attorney continued to insist that he would not seriously consider any offer of placement in a New York institution until appropriate provisions were made for the "special medical care" and "repeated hospitalizations" required for treatment of her familial dysautonomia. The appeals council concluded that no later than the end of June 1981, the same month in which the state offered immediate interim placement pending final confirmation of acceptance at Carmel and four months following the initial recommendation to Ms. Levine's guardian to seek placement at Bais Ezra, there was a high probability that Ms. Levine would have been placed in New York. It further found that no significant placement impediments in the form of priority for other classes of individuals then existed. We agree with the appeals council that Ms. Levine had a duty to investigate these specific placement recommendations, and that she cannot benefit from her willful refusal without good cause to undergo examination for potential placement. Thus, we affirm the appeals council's conclusion that by the close of June 1981, facilities in New York were available to Ms. Levine.

We also agree with the appeals council that the institutions identified for placement in 1981 were appropriate. Ms. Levine contends that the institutions identified in 1981 were inappropriate because they did not provide adequate back-up medical services or emergency service for her dysautonomic tantrums. However, the appeals council had ample evidence from which to conclude that the institutions identified for placement in 1981 were capable of providing the requisite services. We agree with the appeals council that

> [t]he record demonstrates that [Ms. Levine's] overall functioning had improved to the extent that her seizures or dysautomic episodes were quite infrequent and that she had made several trips outside Elwyn without staff supervision and thus had been considered for placement in a community residence. Second, the evidence shows that both the Bais Ezra and the BFY operated facilities had overnight staffing with back-up hospital service.... Moreover, based on a preliminary review of the psychological evaluations of [Ms. Levine] provided to them, BFY indicated that [Ms. Levine] would be appropriate for admission into their new Williamsburg facility opening in December 1981.... Although the record demonstrates that the major concern prompting the necessity for "regular medical monitoring" and "emergency back-up hospital service" was the possibility of the recurrence of the "seizures" or ... dysautonanic tantrums, ... [Ms. Levine] does not show that her periodic hostile outbursts ... are qualitatively different from seizures experienced by other mentally handicapped individuals and thus require management by specially trained personnel other than in restraint techniques or that there are other disease manifestations so unique as to require specialized training for medical or non-medical care staff. Nor has [Ms. Levine] ... shown why New York hospitals adjoining appropriate residential facilities cannot handle occasional hospital-

izations of the claimant as may be required due to dysautonomic tantrums. There is no evidence in the record to show that New York hospitals could not apply the necessary sedation and restraint techniques for immediate medical management or acquire in timely fashion the necessary medical consultation to bring Ms. Levine through a dysautonomic episode. Indeed, it is clear that they had done so for many years prior to Ms. Levine's entrance into Elwyn in 1968.

*Levine* at 12–13.

Ms. Levine also challenges the appropriateness of these placements on the ground that they would have required her to travel independently to a day care program. She claims that her awkward gait renders her unable to climb bus and subway stairs making such travel impossible. The appeals council based its conclusion that Ms. Levine would be able to ascend the steps of buses and subways on a physical therapist's report stating that Ms. Levine could ascend and descend railed stairs at a normal pace and that, despite some deviations from the norm, her gait pattern was functional and her motor functioning was sufficient so as not to interfere with independence at community mobility skills. Despite Ms. Levine's challenge to the accuracy of the physical therapist's report, we believe that the appeals council could have fairly concluded that the physical therapist's expert opinion "appears consistent with the significant number of activities of daily living which [Ms. Levine] is able to carry out independently." *Levine* at 13.

### 2. Undue Hardship

■ The evidence also supports the appeals council's conclusion that as of July 1981, Ms. Levine's removal from Elwyn would not have constituted an undue hardship. Ms. Levine's physical and mental functioning had improved during her stay at Elwyn. In 1975, the Elwyn staff recommended that Ms. Levine be considered for transfer to a less restrictive environment

such as a community residence facility. However, they expressed reservations due to her difficulty adjusting to peers and the possibility of experiencing dysautonomic episodes. Five years later, the New York team stated that small community based residential programs could be appropriate for Ms. Levine if there was regular medical monitoring as well as a hospital staff able to treat her during a dysautonomic episode. The appeals council thus had a substantial basis for stating, "In consideration of [Ms. Levine's] improved overall functioning, including a significant reduction in the frequency of the 'seizures,' the tightly structured and controlled environment of Elwyn no longer appears necessary to an adequate adjustment of the claimant to daily living." *Levine* at 15. After July 1981, the Elwyn facility was not so far superior to appropriate available facilities in New York as to make Ms. Levine's removal from Elwyn an "undue hardship." Ms. Levine does not challenge this finding in any event.

III.   Conclusion

There is substantial evidence to support the findings of the appeals council. The motion to reject those findings is denied.[3] The clerk will enter judgment for the plaintiffs for all sums due and owing them under the appeals council's decision.

SO ORDERED.

---

**3.** The plaintiffs do not challenge the appeals council's findings that neither plaintiff was receiving medical care and services within the meaning of the Social Security Act when institutionalized out-of-state. Moreover, these findings appear correct.