849 F.2d 610
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Frank ROBERTS, Plaintiff-Appellant,
v.
CLEVELAND CLINIC FOUNDATION, Defendant-Appellee.
 No. 86-3895.
 United States Court of Appeals, Sixth Circuit.
 June 10, 1988.
 
 Before WELLFORD and RALPH B. GUY, Circuit Judges; and JAMES HARVEY*, Senior District Judge.
 PER CURIAM.
 
 
 1
 The following facts are undisputed in this case. Plaintiff Frank Roberts was hired by the defendant hospital Cleveland Clinic Foundation ("CCF") on May 28, 1959 as a porter in its maintenance department. Roberts at first proved to be a good worker, and was eventually allowed to transfer to the electrical department of CCF as an Electrician's Helper. Soon after, Roberts received permission to work overtime with electricians so that he could learn their trade and increase his value as an employee. Roberts was eventually promoted to the class of "Electrician A."
 
 
 2
 Sam Tripi was an electrician when Roberts set out to learn his trade, and assisted him in learning it. He was the man who ultimately recommended that Roberts be promoted to the classification of Electrician A. During his tenure at this level Roberts received good evaluations from Tripi and others. Tripi eventually became Superintendent of the Electrical Department and his previous position of Assistant Supervisor became vacant. Roberts and others put in applications for it. When Roberts was not chosen for the position, he filed his first discrimination action.
 
 
 3
 Roberts filed this racial discrimination charge with the Equal Employment Opportunity Commission and its Ohio counterpart in 1976. Although neither EEOC nor the Ohio agency officially found that discrimination had occurred, the EEOC negotiated a settlement with CCF whereby Roberts received $120 in back pay. CCF also responded to Roberts' charges through an arrangement by which Roberts and Mason, the white person selected instead of Roberts, rotated into and out of the Assistant Supervisor position at six-month intervals. Roberts continued to receive generally satisfactory evaluations during this time.
 
 
 4
 In December 1978, Ed Cierebiej was demoted from his supervisor position and Roberts bid for this vacancy. William Breyer, Director of CCF's Facilities Engineering Department, Tripi, and David Posch, a member of CCF's Employee Relations Department, considered Roberts' application. Although both Tripi and Breyer expressed concern about Roberts' expertise, he was given the job and title of acting supervisor conditioned upon his agreement to attend classes at Parma Trade School, and to receive on-the-job training from Tripi. Roberts agreed to this and was promoted on January 14, 1979. As acting supervisor and supervisor, Roberts was responsible for CCF's Electric Shop and the employees responsible for keeping CCF's electrical needs and repairs met. After Roberts assumed these new duties, Tripi's evaluations of Roberts dropped from satisfactory to generally unsatisfactory.
 
 
 5
 In August, 1980 Breyer was succeeded by E. Glenn Hess as Engineering Director of CCF. Hess decided that Roberts was entitled to be given the title of full supervisor, as he had been known only as acting supervisor for some time. Hess and Donald Stevens, his newly hired assistant, instituted a special evaluation program to be used to evaluate all of CCF's maintenance supervisors. The program involved discussions with supervisors and "walkthroughs" of new projects with supervisors in which they discussed the projects with evaluators. Hess and Stevens selected Roberts and George Schadenfroh (a white man) for this evaluation procedure because at the time they were the source of most complaints.
 
 
 6
 Roberts' special evaluation was conducted by Stevens and Tripi. Both agreed that Roberts' knowledge about CCF's electrical system was inadequate. Three separate evaluations were done on Roberts during this time, and each reflected a basic lack of knowledge of CCF's electrical system. As a result of these evaluations Hess decided that Roberts would be demoted to Electrician A in the same manner that Cierebiej had been demoted. Schadenfroh was similarly demoted.
 
 
 7
 These demotions were not an unusual occurrence in CCF's Electrical Department. During Roberts' employment with CCF, the department had also demoted a number of white employees from supervisory positions to a level analogous to Electrician A. Roberts' demotion was noteworthy only because he was the only black working at the level of supervisor.
 
 
 8
 Following his demotion in 1984, Roberts filed an action claiming racial discrimination and retaliatory demotion based on 42 U.S.C. Sec. 1981 and Title VII. At the trial, the district court made the following observations about the procedure it would follow in submitting the Sec. 1981 claim to the jury and its independent consideration of the Title VII aspect of the case.
 
 
 9
 Let the record show that after consultation with both sides, both sides are agreeable to the following proposition: That the matter, after having the jury deliberate, if the jury finds for the Defendant on the '81 cause of action, that will conclude this case. If the jury finds for the Plaintiff on the '81 action, then Counsel will provide to this Court proposed findings of fact and conclusions of law, and the Court will make its decision on the Title VII cause of action bearing in mind that the Court will consider what the jury has done and in an advisory capacity only. Is that the agreement as I understand it?
 
 
 10
 Counsel for each party acceded to this statement of the agreement.
 
 
 11
 The Sec. 1981 claims were submitted to a jury, which found for CCF on the race discrimination charge, but awarded Roberts $5000 on the retaliatory demotion charge. The district court independently considered the evidence in deciding the Title VII claim and found that no retaliation had taken place. The district court thus agreed with the jury's determination that the plaintiff was not entitled to prevail on the race discrimination charge. In addition, however, it found no retaliation:
 
 
 12
 The Court finds that plaintiff failed to prove his prima facie case by preponderance of the evidence. The Court finds that defendant did meet the burden of articulating a nondiscriminatory reason for plaintiff [sic] discharge. The Court further finds that plaintiff failed to prove by a preponderance of the evidence that defendant's articulated reason for the discharge was a pretext for racial discrimination. Therefore, judgment is rendered in favor of defendant.
 
 
 13
 The court also granted the defendants' motion for a judgment notwithstanding the verdict on the Sec. 1981 retaliation claim. In granting the motion, the court reached the following conclusion:
 
 
 14
 On April 15, 1986, the jury returned a mixed verdict finding for the defendant on plaintiff's allegation of racially motivated demotion but holding for the plaintiff on his allegation of retaliation and granting him a judgment in the amount of Five Thousand Dollars ($5,000). After careful review of the briefs and all other evidence submitted in this case the Court finds that the findings of fact and conclusions of law stated above warrants a finding that the verdict returned by the jury is inconsistent with the evidence and the law to be applied. Therefore, defendant's motion for judgment notwithstanding the verdict is HEREBY GRANTED.
 
 
 15
 The primary issue raised in this appeal is whether the district court properly granted defendant's motion for judgment notwithstanding the verdict in respect to the Sec. 1981 retaliation claim.
 
 
 16
 In the Title VII context, courts have stated that in order to prevail in actions based on racial discrimination a plaintiff must show that his employer's discriminatory motive caused the employment action. Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981). In the context of a retaliation claim, plaintiff must prove "(1) that he engaged in activity protected by Title VII; (2) that he was the subject of adverse employment action; and (3) that there exists a causal link between his protected activity and the adverse action of his employer." Jackson v. RKO Bottlers of Toledo, Inc., 743 F.2d 370, 375 (6th Cir.1984). This same burden also applies to section 1981 claims. Id. at 378; Daniels v. Board of Education of Ravenna City School District, 805 F.2d 203, 207 (6th Cir.1986). If plaintiff can make out a prima facie case with these elements, Burdine requires the employer to "articulate some legitimate, nondiscriminatory reason" for the adverse action. 450 U.S. at 253. Plaintiff must then prove that the employer's articulated reason is a "pretext for discrimination." Id. at 256; Daniels, 805 F.2d at 207.
 
 
 17
 In the context of a motion for judgment notwithstanding the verdict, it is clear that a jury verdict may be set aside only if reasonable men could draw only a contrary conclusion from the evidence. Hill v. Spiegel, Inc., 708 F.2d 233 (6th Cir.1983). The question, then, is whether Roberts' evidence taken in a context favorable to him could support a jury's finding in his favor.
 
 
 18
 As an initial matter, we are concerned about the district court's articulation of the evidentiary standard for granting a motion for judgment notwithstanding the verdict. The court's order, in pertinent part, is as follows:
 
 
 19
 After careful review of the briefs and all other evidence submitted in this case the Court finds that the findings of fact and conclusions of law stated above warrants a finding that the verdict returned by the jury is inconsistent with the evidence and the law to be applied. Therefore, defendant's motion for judgment notwithstanding the verdict is HEREBY GRANTED.
 
 
 20
 (Emphasis added).
 
 
 21
 This is the incorrect standard for judgment notwithstanding the verdict. As noted above, the court must conclude that no reasonable jury can find for the plaintiff before it can overturn the verdict. However, we are obligated to reverse the district court based on this error only if its ultimate conclusion was improper; if its actions can nonetheless be justified, the decision can be upheld. Dandridge v. Williams, 397 U.S. 471, 475 n. 6 (1970); cf. Pilarowski v. Macomb County Health Department, 841 F.2d 1281, 1286 (6th Cir.1988) (any grounds asserted before the district court may justify upholding its decision on appeal). In this case the defendant raised a proper motion to render a judgment contrary to the jury's verdict. After reviewing the record, we are satisfied that the court's decision to overturn the jury's verdict was proper.
 
 
 22
 We agree with the district court that Roberts was unable to produce sufficient evidence of retaliatory demotion. The record shows that over seven years elapsed between Roberts' initial complaint to EEOC and his demotion in 1984. More important is the fact that the people who ultimately decided to demote Roberts were not with CCF when the 1976 charges were filed. Hess and Stevens came to the organization after that dispute had been settled, and there is no evidence that they knew about it. The one link between the two incidents, Tripi, was only one person evaluating Roberts' performance. There is no evidence that his discriminatory desires, assuming they existed, effected Hess' decision to demote Roberts. This, in combination with other evidence that Roberts was not able to handle his duties as supervisor, lead us to conclude that no reasonable jury could conclude his demotion came as a result of discrimination.
 
 
 23
 In light of that conclusion, we find no need to consider the issue of whether the court could reject the jury's finding of retaliation in finding no violation of Title VII. As matters now stand, the two verdicts are consistent.
 
 
 24
 We accordingly AFFIRM the decision of the district court.
 
 
 
 *
 THE HONORABLE JAMES HARVEY, United States District Court for the Eastern District of Michigan, sitting by designation